**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2866-19

COMPREHENSIVE
NEUROSURGICAL, P.C., d/b/a
NORTH JERSEY BRAIN AND
SPINE CENTER, PATRICK A.
ROTH, MD, ROY D. VINGAN,
MD, GEORGE J. KAPTAIN,
MD, DANIEL E. WALZMAN,
MD, HOOMAN AZMI, MD,
HARSHPAL SINGH, MD,
KANGMIN DANIEL LEE, MD,
REZA J. KARIMI, MD, BRUCE
C. ZABLOW, MD, UGO
PAOLUCCI, MD, and
MOHAMMED FARAZ KHAN,
MD,

       Plaintiffs-Respondents/
       Cross-Appellants,

v.

THE VALLEY HOSPITAL,
THE BOARD OF TRUSTEES
OF THE VALLEY HOSPITAL,
and VALLEY HOSPITAL
PRESIDENT AUDREY MEYERS,

       Defendants-Appellants/
       Cross-Respondents,

and

NEUROSURGICAL
ASSOCIATES OF NEW
JERSEY, P.C., and
ANTHONY D'AMBROSIO,
MD,

     Defendants.

_____

Argued May 3, 2022 – Decided August 8, 2022

Before Judges Hoffman, Whipple, and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-6794-16.

R. Scott Thompson (Wollmuth Maher & Deutsch LLP) argued the cause for appellants/cross-respondents (Lowenstein Sandler, LLP, attorneys; Joseph A. Fischetti, of counsel and on the briefs; R. Scott Thompson and Camila A. Garces, on the briefs).

Joseph B. Fiorenzo argued the cause for respondents/cross-appellants (Sills Cummis & Gross, PC, attorneys; Joseph B. Fiorenzo, of counsel and on the briefs; Stephen M. Klein, on the briefs).

Ross A. Lewin argued the cause for amicus curiae New Jersey Hospital Association (Faegre Drinker Biddle & Reath LLP, attorneys; Ross A. Lewin, of counsel and on the brief).

PER CURIAM

Defendant, The Valley Hospital (Valley Hospital or the Hospital), appeals from a February 6, 2020 final judgment entered by the Law Division in favor of plaintiffs in the amount of $26,341,828.35. The judgment represents $24.3 million in damages awarded by a jury, $662,387.25 in costs, litigation expenses, and attorney's fees, and $1,379,441.10 in prejudgment interest.

Plaintiffs are eleven neurosurgeons, individually, and their practice group, New Jersey Brain and Spine Center (NJBSC). Plaintiffs held privileges at several hospitals, including Valley Hospital, located in Ridgewood, and Hackensack University Medical Center (Hackensack). For more than a decade before the subject litigation, NJBSC doctors provided on-call coverage in the emergency department (ED) at Valley Hospital; during this time, plaintiffs were instrumental in Valley Hospital acquiring specialized equipment, including biplane angiography and Gamma Knife,[1] equipment that allowed stroke patients to receive treatment at Valley Hospital.

Plaintiffs' long-standing arrangement changed in 2015, when Valley Hospital entered into an exclusive agreement with defendant Neurosurgical

---

[1] Biplane angiography provides detailed three-dimensional images of blood vessels in the brain, and allows doctors to diagnose and treat stroke, brain aneurisms, tumors, and other conditions. Gamma Knife radiosurgery permits doctors to use focused radiation therapy to treat tumors and other abnormalities in the brain.

A-2866-19

Associates of New Jersey (also known as Columbia Group), another practice group of neurologists with privileges at Valley Hospital. The agreement granted Columbia Group exclusive rights to the ED coverage and to the use of the Gamma Knife and biplane angiography. On December 22, 2015, Valley Hospital issued a memorandum advising the hospital's entire Department of Neuroscience that, after "almost a year of study,"[2] the Board of Trustees "unanimously voted to have Emergency Department on-call coverage for unassigned neurosurgery patients, as well as Gamma Knife services and neurointerventional bi-plane angiography procedures at the Hospital provided via an exclusive arrangement" with Columbia Group.

In response, plaintiffs filed suit against Valley Hospital, its Board of Trustees (the Board), its president, Audrey Meyers, and Columbia Group. Plaintiffs asserted multiple contract and tort claims, including breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference with prospective economic advantage. Plaintiffs alleged

_____

[2] The "almost a year of study" refers to the work of Valley Hospital's Staff Development Committee, dated July 13, 2015, and entitled "Developing a Neuroscience Center of Excellence, A White Paper Prepared for the Staff Development Committee" (the White Paper). Much of the testimony and evidence at trial focused on the events and circumstances that lead to the preparation of the White Paper.

that Valley Hospital and its president "have had a longstanding contentious rivalry with Hackensack," which motivated the termination of "the clinical privileges [that plaintiffs] have long enjoyed at Valley [Hospital], and as to services they helped develop and create," as punishment for plaintiffs' affiliation with Hackensack.

By the time of trial, Valley Hospital was the only remaining defendant. After the conclusion of testimony, only two claims remained for the jury to consider – breach of contract and breach of the implied covenant of good faith and fair dealing. The jury returned a no-cause verdict on plaintiffs' breach of contract claim, finding a contract existed but no breach occurred; however, on the implied covenant claim, the jury returned a verdict in favor of plaintiffs and concluded that plaintiffs sustained damages of $24.3 million as the result of Valley Hospital's wrongful conduct.

On appeal, Valley Hospital argues that the implied covenant claim should not have made it past summary judgment and that the trial judge improperly ruled on a motion that allowed plaintiffs to retain documents that Valley Hospital had attempted to claw back. Valley Hospital additionally contends that the damages were excessive, challenges the admission of the testimony of plaintiffs' expert, and the trial court's decision to limit the testimony of its own

expert. Valley Hospital also asserts that opposing counsel's comments during summation requires reversal and that the trial court erred in granting offer of judgment awards.

The New Jersey Hospital Association (NJHA) has submitted an amicus curiae brief in support of Valley Hospital's appeal, asserting that the verdict in this case represents an "impermissible expansion of the rights of medical staff members to challenge managerial actions undertaken by a hospital's board."

After carefully reviewing the record and the arguments presented, we affirm, finding no basis to disturb the judgment entered in plaintiffs' favor.

I.

We derive the following facts from the record.

Plaintiffs' History with Valley Hospital

In approximately 2003, Valley Hospital reached out to plaintiff Patrick Roth, M.D. and his neurosurgical group to become part of the medical staff there. According to Dr. Roth, Valley Hospital made this request because the hospital "only had . . . three active neurosurgeons," and they were older doctors, who had "restricted their practice considerably to just [the] spine"; as a result, if patients had "difficult brain problems[,] the neurosurgeons" who were handling the ED call "wouldn't even come in, they would just" order "an automatic

A-2866-19

transfer to Columbia University in New York." Dr. Roth explained that, as he understood it, part of the job of his group was to "stop this flow out of Valley Hospital . . . and to build a . . . modern neurosurgical practice [at Valley Hospital]."

To accomplish this goal, Dr. Roth testified that plaintiffs "made a huge investment" and expended "a tremendous amount of time and energy into cultivating the relationships with the people [who] man the emergency room." As an example of his group's efforts and commitment, Dr. Roth cited the 2005 hiring of plaintiff Daniel E. Walzman, M.D., who started the endovascular program at Valley Hospital, allowing for the completion of endovascular procedures without transferring the patient to another hospital. When he arrived in 2005, Dr. Walzman discovered that Valley Hospital lacked the necessary equipment to treat strokes, leading to detrimental delays in treatment. As an interim measure, Dr. Walzman repurposed equipment intended for cardiac patients for stroke diagnosis. He then assembled a proposal for a biplane suite, after multiple out-of-state trips to view other hospitals' equipment, helped obtain state funding for the biplane, and then trained Valley Hospital's technicians and staff in the treatment of endovascular events.

A-2866-19

In large part due to Dr. Walzman's efforts, Valley Hospital became one of only a handful of facilities in New Jersey to receive the designation of Comprehensive Stroke Center by the Department of Health and Senior Services. Dr. Walzman testified he was on emergency endovascular call at Valley Hospital from 2006 until 2010, except for three weeks, "covering every patient with an ischemic stroke [who] was eligible for a stroke thrombectomy."

Dr. Roth further explained that plaintiffs "employ[ed] mid-level providers to help . . . with quality," and expanded the number of neurosurgeons in their group from two neurosurgeons to twelve, between 2003 to 2015. As a result of these efforts, Dr Roth testified that plaintiffs expected the ED call at Valley Hospital "would be ours forever." He explained,

> I looked at it as a quid pro quo, meaning . . . we're going to build this emergency room, we're going to modernize it, we're going to stop this flow of patients from outside your hospital to Columbia [University] and . . . we're going to do a great job of manning it and . . . in return[,] it's ours to lose.

According to Dr. Roth, plaintiffs continued to operate the ED with that understanding until December 2015.

Six years earlier, in 2009, the amicable relationship between NJBSC and Valley Hospital began to deteriorate. At that time, Valley Hospital began an unsuccessful battle to stop Hackensack from reopening Pascack Valley Hospital,

rebranded as Hackensack North, six miles from Valley Hospital. Initially, Valley Hospital made an unsuccessful attempt to purchase the site. Thereafter, Meyers opposed Hackensack's proposal in the press and testified against it before the State Health Planning Board, where she asserted that Hackensack North "will have an adverse impact on the health care in the region[,] [w]ith annual losses projected to be as high as a loss of $35 million to Valley Hospital . . . ." Notwithstanding Valley Hospital's opposition, Hackensack was granted the required certificate of need to open Hackensack North. After Valley Hospital filed an unsuccessful appeal, Hackensack North opened in May 2013.

On June 6, 2013, two weeks after Hackensack North reopened, Dr. Walzman and plaintiff Roy D. Vingan, M.D. attended a meeting with Meyers and Gail Callandrillo, head of Valley Hospital's planning department and future White Paper author. Prior to the meeting, Dr. Walzman decided to memorialize the meeting by recording it because, in his "prior dealings with administration at Valley Hospital, [he] found them to say one thing at one time and then say another thing at another time," and so he "was just trying to have an accurate record" of the meeting.

At the meeting, Meyers expressed her dissatisfaction with plaintiffs' role in the reopening of Pascack Valley as Hackensack North. According to Dr.

Walzman, Meyers "expressed direct displeasure" that Dr. Vingan had been appointed the chairman of surgery at Hackensack North. Dr. Walzman recounted that Meyers made "pretty direct statements" that she "had major issues" with what she perceived to be "our lack of loyalty" to Valley Hospital; she made it clear that Valley Hospital was tracking where the doctors were doing procedures and was "upset that [NJBSC] was not doing more procedures at Valley [Hospital]," and doing more at Hackensack.

During expedited discovery, discussed later in this opinion, plaintiffs unearthed what they describe as "a premeditated scheme by Valley [Hospital] senior administrators to manufacture a pretextual healthcare basis to support plaintiffs' ouster." In denying Valley Hospital's post-trial motions, the trial judge stated that plaintiffs "provided evidence that [d]efendant had made a predetermined decision to revoke [plaintiffs'] privileges, such as [d]efendant's own general counsel indicating that they needed to build 'a strong case ahead of time,' and evidence upon which the jury could conclude that the study was a sham."

Valley Hospital Bylaws

When NJBSC's doctors received and renewed their privileges at Valley Hospital, they received copies of the Bylaws of the Medical Staff of the Valley

Hospital (the Bylaws). Article IV of the Bylaws addresses "Medical Staff Appointment," and states that appointment "is a privilege that shall be extended only to professionally competent individuals who continually meet the qualifications, standards, and requirements set forth in" the Bylaws. As part of the Bylaws, an "[a]ppointment to the Medical Staff shall confer on the appointee only such clinical privileges which have been applied for, as have been recommended by the Medical Board and approved by the Board of Trustees in accordance with" the Bylaws.

Article V of the Bylaws specifies that Active Medical Staff "shall consist of all Medical Staff Members who agree to comply with . . . terms and conditions," including "to maintain, within the Hospital's primary service area, an active practice and office in compliance with the Rules and Regulations of the Medical Staff, to be on call to the Hospital's Emergency Department" and "to serve in the clinics and care for clinic and unassigned patients as required by the department to which he [or she] is assigned."

Article VI of the Bylaws details the procedure for appointing and reappointing members of the medical staff. The Bylaws require that "[a]ll recommendations for appointment with requested privileges must specifically recommend the clinical privileges to be granted." Additionally, if an applicant

11

is recommended for appointment with less or different privileges than he or she requested, or is qualified by probationary or other limited conditions, the applicant may object and receive a fair hearing. An applicant may also be entitled to a fair hearing if the Joint Conference Committee recommends appointment with clinical privileges that are less than those recommended by the Medical Board or recommends rejection.

When determining whether reappointment of medical staff is warranted, the Bylaws state the decision must be based on the review of various factors, including "professional competence"; "character, reputation, ethics, and conduct"; "capacity to satisfactorily treat patients"; "overall competence"; and "general attitude toward patients, the Hospital, and the public."

The Bylaws state that medical staff members "shall be entitled to exercise only those clinical privileges specifically granted" to them. Every application for appointment or reappointment "shall contain a request for the specific clinical privileges desired by the Applicant," and the evaluation of their request "shall be based upon the Applicant's current licensure, relevant training or experience, current competence and ability to perform the privileges requested, and" an appraisal by the department director and/or Credentials Committee.

Moreover, the rules and regulations of the medical staff state that, "[i]n accordance with the Bylaws of the Medical Staff of the Hospital, members of the Medical Staff are responsible for being on call to the [ED]." It provides that the "on-call schedule is not a right or a privilege, but is a responsibility that may be removed at the discretion of the Director of a Department."

The White Paper

The White Paper's introduction states that Valley Hospital "desires to establish the Hospital as a Neuroscience Center of Excellence and regional leader in providing neurosurgery services." It states that Valley Hospital already "has a strong neurosurgical service line" which "has grown significantly over the past several years," with "twenty-three (23) neurosurgeons on its active medical staff, represented by three groups practices and one solo practitioner." The three practice groups at the time were: Columbia Group, NJBSC, and Bergen Passaic Neurosurgery. NJBSC and Columbia Group, the two largest groups, together accounted for ninety-four percent of all neurosurgical cases at Valley Hospital in 2014.

Some of the findings of the White Paper included that Columbia Group performed 708 procedures at Valley Hospital compared to 184 performed by NJBSC in 2014. In examining the quality and cost profiles of the two groups,

the White Paper indicated that NJBSC had higher rates for length of stay and higher direct costs than Columbia Group. The report noted that six of the nine NJBSC doctors also held titles at Hackensack, where they attended 940 patients, versus 57 patients at Valley Hospital.

A section in the study presented clinical research as "a major strategic initiative" for Valley Hospital and "essential to advancing the goal of becoming a Neuroscience Center of Excellence." It further stated that in 2014, Valley Hospital engaged Navigant "to conduct an in-depth analysis of its research efforts and develop a strategic plan for enhancing its capabilities in this area." Navigant "highlighted the research potential in the areas of cardiology and neurosciences," and recommended that Valley Hospital invest money to bolster research in those areas. The study stated that Columbia Group had initiated eighteen "randomized trials and retrospective review projects relating to stroke and neurosurgery," while NJBSC "currently ha[d] one open trial" at Valley Hospital.

The White Paper included an "analysis of quality and cost of neurosurgical services," which specified that "[i]n order to develop a Neuroscience Center of Excellence," Valley Hospital had "undertaken a detailed study of the cost, quality and volume of neurosurgical services provided over several years, by the

two largest neurosurgical groups": Columbia Group and NJBSC. Since these two groups accounted for ninety-four percent of all neurosurgical cases in 2014, and were the only groups doing ED calls, the White Paper stated that "Administrative Staff analyze[d] data relating to volume, quality, utilization, and complication rates for these two groups."

The White Paper then purported to examine the quality and cost profiles of NJBSC versus Columbia Group. The study highlighted numerous findings, including that, for neurosurgery, NJBSC had "higher rates for length of stay (LOS) and higher direct costs in both the inpatient and outpatient areas," than Columbia Group had, and that the cost differences had been "observed over a three[-]year period from 2012 through 2014, suggesting that this is a long-term pattern and not a short-term aberration." Additionally, it noted both groups performed "similar procedures and with the exception of the Gamma Knife, there appear[ed] to be no specific expertise that one group" had over the other. The White Paper further stated that a composite quality score compiled by Crimson Market Advantage (Crimson),[3] which considered readmissions, the average length of stay and complications, "six of the eight physicians in

[3] Hospitals use Crimson to build a database that provides information on physicians to help assess quality, costs, and patient outcomes.

A-2866-19

[NJBSC] showed statistically significant negative variances in quality than those exhibited by" Columbia Group in its entirety.

When considering neuro-intervention, the White Paper found that both groups had two doctors who performed procedures with the biplane, and when compared, there were "statistically significant differences in direct costs and average LOS, as well as notable differences in observed versus expected complication rates," which favored Columbia Group.

The White Paper also considered the economic impact of the two group's quality and cost profiles, noting that six of the nine NJBSC doctors also held titles at Hackensack, and that NJBSC's "primary hospital is Hackensack," based on a review of Hackensack's inpatient service lines showing that NJBSC attended 940 patients, versus 57 cases at Valley Hospital for the same service lines. The study estimated that Valley Hospital lost $29 million from August 2013 through July 2014, due to "inpatient and outpatient 'leakage'[4] [that] show[ed] that none of the [NJBSC] physicians [had] more than [twenty percent] of their attending revenue at the hospital," assuming that the care would have been provided at Valley Hospital. It also highlighted that NJBSC performed

---

[4] "Leakage," a statistic generated by Crimson, measured the amount of revenue a physician generated at a location other than Valley Hospital.

76.2 percent of its work at Hackensack, 14.3 percent at Holy Name Medical Center, and only 4.7 percent at Valley Hospital.

The White Paper stated that Columbia Group was "more than twice as likely to have a patient return for a procedure following their emergency visit consultation," and stated that those results were "considered statistically significant" and suggested that NJBSC may have been "accruing patients from an Emergency Department consult and subsequently performing those procedures at another facility, presumably Hackensack given their strong connection to that organization."

The White Paper concluded that the "analysis undertaken by Management demonstrates that [Columbia Group] outperforms [NJBSC] in important quality measures and cost efficiencies identified" in the study. It summarized that Columbia Group "demonstrated sustained commitment" to the goal of creating "a Neuroscience Center of Excellence," by

> (i) consistently utilizing the institution's facilities for the majority of its surgical procedures; (ii) permitting both physicians and staff to hone their skills[;] (iii) designing and undertaking significant clinical research and protocols which allow [Columbia] Group and the Hospital to remain in the forefront of neurosurgical research and (iv) providing clinical expertise in the operation of the Gamma Knife and the Neurointerventional Suite.

A-2866-19

Thus, the White Paper recommended that the Staff Development Committee in turn recommend to the Board that 1) Columbia Group be assigned to the ED call and 2) management negotiate an agreement with Columbia Group "to provide Gamma Knife and Neuroendovascular services" at Valley Hospital. Approval of these recommendations, the White Paper concluded, will:

- Support the goal of establishing a Neuroscience Center of Excellence;

- Standardize care;

- Support and expand the Clinical Research effort;

- Reduce complication rates, lengths of stay and associated costs;

- Improve overall quality of care;

- Provide fiscal stability to the Hospital and the neurosurgery services.

The White Paper was presented to the members of the Board and Meyers on July 13, 2015, at the Board's Staff Development Committee meeting.

The Exclusive Agreement and Litigation

Relying on the results of the White Paper, on December 16, 2015, the Board voted to enter into an agreement with Columbia Group, giving it exclusive access to ED call and exclusive use of the Gamma Knife and biplane angiography as of February 1, 2016.

On December 22, 2015, in a memo to the members of the Department of Neuroscience, Meyers announced that, to further Valley Hospital's "efforts to be a Neuroscience Center of Excellence and a regional leader in providing high quality, cost effective neurosurgery services to the communities it serves," the Board voted to enter into this exclusive agreement with Columbia Group. The memo explained that the "decision was made after almost a year of study by the Board's Staff Development Committee," and that Valley Hospital's goal was to establish itself as a center of excellence and "regional leader in providing high quality, cost[-]effective neurosurgery services . . . ." On that same date, Meyers emailed a letter to plaintiffs, attaching the memo and explaining that it "details the unanimous decision of the Board to have Emergency on-call coverage," and Gamma Knife and biplane procedures done via an exclusive agreement with Columbia Group.

On December 28, 2015, a Valley Hospital administrator sent an email to NJBSC that confirmed plaintiffs would no longer have access to the Gamma Knife and biplane as of February 1, 2016. In a letter dated January 19, 2016, plaintiffs' attorney demanded that Valley Hospital revoke the exclusive agreement, and restore plaintiffs' access to the Gamma Knife and biplane, as well as their ED call coverage. The letter also requested a hearing before the

Board, as provided for in the Bylaws. Valley Hospital's counsel responded that the exclusive agreement did "not trigger an entitlement to the procedural safeguards" in the Bylaws. On that same date, plaintiffs filed a complaint in the Chancery Division, naming as defendants Valley Hospital, its Board of Trustees and its president, Audrey Meyers, and Columbia Group. Plaintiffs sought a permanent injunction restraining the Valley Hospital defendants from terminating plaintiffs' medical privileges, compensatory damages, and counsel fees and costs.

On January 28, 2016, the Chancery Division held a hearing on plaintiffs' motion for temporary injunctive relief, denying the motion but ordering expedited discovery. During expedited discovery, the defendants produced numerous emails that it later attempted to claw back as confidential or as privileged communications with its general counsel, Robin Goldfischer. In a letter dated April 6, 2016, counsel for the defendants informed plaintiffs' counsel that defendants had inadvertently produced numerous emails and demanded their return or destruction. The court would later deny Valley Hospital's attempt to claw back the emails.

Many of the emails discussed events and circumstances that gave rise to the White Paper. Plaintiffs argue that these emails presented compelling

A-2866-19

evidence that Valley Hospital created a false impression that the White Paper was an objective study, with no predetermined decision as to which group should get the exclusive contract. We summarize, in chronological order, some of the emails which tend to show that the outcome of the White Paper was predetermined to favor Columbia Group.

In an email dated December 19, 2012, Callandrillo attached an article from Hackensack that highlighted a clinical trial on vaccines that plaintiff George Kaptain was conducting there, and stated that Dr. D'Ambrosio "remains very concerned that the other [n]eurosurgery group is benefiting from the intellectual capital that he and his group bring to Valley [Hospital]," and that the vaccine trial was another example. Callandrillo called the article "rather disturbing."

In an email chain from March 6 and 7, 2013, Dr. D'Ambrosio forwarded an email to Valley Hospital Vice President Karteek Bhavsar and Callandrillo, discussing issues with NJBSC's scheduling and booking of Valley Hospital's operating room. Dr. D'Ambrosio told Bhavsar and Callandrillo that if the operating room scheduling problems reported in the email were accurate, then it was an "example of potentially dangerous physician communication, temperament, and judgement that is not necessary."

Bhavsar responded separately to Callandrillo, telling her that he spoke with Dr. D'Ambrosio, who "was very passionate on how the other group was hurting Valley [Hospital's] reputation," and that "Columbia Group is very available to be THE Valley Neurosurgery group." Dr. D'Ambrosio had told Bhavsar that he hoped the email "would be a catalyst in moving us towards" the direction of Columbia Group "tak[ing] it all on."

Callandrillo replied to Bhavsar that she had spoken with Meyers, who said that "moving to an exclusive contract really is the nuclear option," to which Bhavsar responded, "Kaboom." Callandrillo replied, "The day will come . . . believe me."

An email dated March 11, 2013, from Callandrillo to Meyers looked at the procedures, admissions, and consultations of Columbia Group doctors and NJBSC's doctors. Callandrillo stated that if they "imposed a [twenty-five] surgical case limit to cover the ED," it would not "help us much" because three of NJBSC's doctors would be above that case limit. She also noted, "FYI the [Dr.] Roth group gets more consults than [Dr. D'Ambrosio's]."

Additionally, in an email dated April 12, 2013, Bhavsar wrote that Dr. Roth, Dr. Vingan, and Dr. Kaptain, from NJBSC, did not meet the minimum case volume at Valley Hospital that was required to be a part of the Spine Center,

22

and thus, he was going to inform them that they would include the doctors again once they met that volume criteria. Dr. Roth had been co-director of the Spine Center prior to resigning after he had taken a directorship at Hackensack.

Regarding a Crimson analysis from April 2014, Sara Berk, an analyst in the planning department, emailed Callandrillo a data analysis of the Columbia Group and NJBSC. Addressing "quality and utilization," she stated:

> From this broad analysis, it doesn't seem that either group is glaringly different in costs or quality on the whole. To the extent that [NJBSC] might seem a little worse, this may be explainable in part by a higher proportion of their volume coming in through the ED, i.e. sicker patients.

On May 20, 2014, in another email chain with Callandrillo and Meyers, Callandrillo forwarded an email that showed Dr. Roth was a guest speaker and the "Director of Neurosurgery" at Hackensack. Goldfischer responded, "truly unbelievable. Unfortunately, the hospitalist strategy will not stop the out-migration of [Dr.] Roth's cases, given his title and ties to Hackensack."

In an email dated October 31, 2014, Meyers asked Goldfischer if Valley Hospital could work on getting an exclusive contract after they heard that a Gamma Knife patient who "clearly came through our ED" and was a patient at Valley Hospital, then went to Hackensack. Goldfischer responded that there was "nothing we can do if they have privileges," and that "the only thing [they]

23

could do is close the service" to NJBSC, and she asked Meyers if Valley Hospital had "the appetite for this." Goldfischer asked that if the answer was yes, she wanted clarification if they would be "closing the entire service or only the ER?" Meyers responded, "Only the ER for unassigned patients. Be prepared for a lawsuit, so we need to may [sic] a strong case ahead of time."

In a December 5, 2014, email, Meyers told Goldfischer to note Dr. Walzman's new title, which was "Chief of Vascular and Endovascular Neurosurgery, Vice Chairman, Heart and Vascular Hospital at Hackensack University Medical Center."

In an email exchange dated December 11, 2014, Goldfischer told Callandrillo and Meyers that she "believe[d] we need to 'study' this via Staff Development so that we document the thought process for entering into this exclusive arrangement." She wrote that, "unlike hospital-based services, such as pathology or anesthesia," she could not "think of any hospital that has an exclusive contract for ED/Neurosurgical coverage so we are ripe for challenge." Goldfischer further stated that for exclusive contracts in the past they

> were able to point to articles on the importance of, for example, controlling antibiotic utilization in the hospital; the need for a defined group to make decisions regarding antibiotic utilization to control, for example. We had to produce all the information that was provided to the Staff Development Committee and the

24

board on these topics and we were ultimately successful.

Here, I believe we need to analyze the numbers of neurosurgical cases that are migrating out of the ED and show that we will be unable to continue to provide the service if we don't do a sufficient number to keep up our skills, so to speak. We need to paper this carefully.[5]

A December 11, 2014 email shows that Callandrillo requested to have a meeting set up with Goldfischer to discuss "ED coverage (neurosurgery)." She asked that the meeting be before their meeting with Dr. D'Ambrosio that Wednesday.

Additionally, on December 23 and 24, 2014, after a decision to create an "academic relationship" between Valley Hospital and Mount Sinai Hospital was announced, Dr. D'Ambrosio and another senior physician from the Columbia Group, Dr. Donald Quest, expressed to Meyers that "many loyal members" of Columbia Group were upset, and Dr. D'Ambrosio suggested to Meyers that

---

[5] At her deposition, Goldfischer explained that when she said "paper this carefully," she meant that based upon her experience "in the healthcare arena and based upon the litigation involving [a prior exclusive contract involving infectious disease], [she] wanted to be certain that [they] could point to a paper that analyzed the numbers . . . and the other bases upon which we made a decision" if they entered into an exclusive agreement for neurological services.

A-2866-19

Valley "move quickly to help us better understand the neurosurgical implications of this arrangement on our future at Valley [Hospital]."

In a January 13, 2015 email to a Columbia Group colleague, Dr. D'Ambrosio summarized a meeting that Meyers held with Columbia Group to allay their concerns. He stated that Meyers "verbally . . . seem[ed] to understand our concerns and has committed to putting terms in writing to protect our interests." Dr. D'Ambrosio additionally stated that he thought a few doctors from Columbia Group "should discuss two potential opportunities with legal" counsel, including "exclusive contracting for Neurosurgical and Endovascular hospital-based services" and a "joint venture – free standing neuroscience center on newly acquired property in Paramus." He further noted that under those agreements, Columbia Group "must be the only group in their system allowed to take call," and that hospital-owned doctors "should only use our group," and that "only surgeons from our practice can be added to the staff."

Additionally, emails from January 14, 2015, between Callandrillo and other Valley Hospital staff, discussed issues to address with Columbia Group while "in negotiations."

Valley Hospital analyst Carol Grebowiec sent an email to herself on July 20, 2015, that had attached to it notes that accompanied a presentation of data

accumulated in preparation for the White Paper, where she referred to Columbia Group as "the favored group," and "the group we hope to collaborate with." Additionally, the Crimson presentation created by Grebowiec and Katherine Brennan (Senior Analyst of Planning and Business Development), noted the "[p]lanning team and leadership have anecdotal evidence of which group would be a best fit, but need data to support decision." A presentation slide also stated that the "[r]esulting analysis confirms assumptions and team moves forward with exclusive agreement."[6]

In an April 13, 2015, email from Brennan to Grebowiec, she wrote that she was attaching some follow-up items after a phone call, and noting that the "hybrid analysis for building [a] case to align with neurosurgeon group," showed "the data on the group we do not want to align with."

Notwithstanding the evidence that the outcome of the White Paper was predetermined, at her deposition, Meyers testified that as of the February 2015, Callandrillo's "charge was to review the service and the elements of the service; that's what she was doing, she was not pursuing an exclusive contract." Regarding the June 6, 2013 meeting with Dr, Walzman and Dr. Vingan, Meyers

---

[6] Brennan later testified at trial that this presentation was for educational purposes at a new member initiative, and that the data within it was fictionalized from the White Paper.

was asked whether she told them that "loyalty was a very big issue and [Valley Hospital] questioned [plantiffs'] loyalty[?]" She denied having made a statement that Valley Hospital was concerned about loyalty. As the recording later revealed, at the meeting, Meyers expressly stated that "one of the concerns we have is the loyalty issue, and that's worrisome." The recording of the meeting also reflects that Meyers stated that "there are obviously a couple of things that trouble us," including that Dr. Vingan is "now the director of surgery at Pascack Valley[,]" and "[y]ou all have positions at Hackensack. You all have titles at Hackensack." Plaintiff's counsel read these deposition excerpts into the record at the end of plaintiffs' case.

During discovery, the Valley Hospital defendants produced certain documents they later "clawed back" as privileged, citing a stipulated protective order. Plaintiffs then moved to compel the production of those documents. In a written decision dated May 16, 2016, the court granted plaintiffs' motion to compel the documents identified in the claw-back letter, rejecting the claw-back attempt because "Ms. Goldfischer, [d]efendants' in-house counsel, was the study's genesis. It was Ms. Goldfischer who expressed a need for the study and who guided its creation." The Court therefore held, "by relying on the study,

A-2866-19

[d]efendants have waived the attorney-client privilege relating to communications surrounding the study."

On August 10, 2016, the Chancery Division held a hearing on the order to show cause in which plaintiffs were seeking a preliminary injunction and the restoration of their privileges at Valley Hospital, which the court denied. Two months later, the court transferred the matter to the Law Division.

On December 5, 2016, plaintiffs filed an amended complaint in the Law Division, added Anthony D'Ambrosio, M.D., a partner of the Columbia Group, as a defendant. The amended complaint asserted two tortious interference counts against Columbia Group and Dr. D'Ambrosio.

Trial Testimony

Trial occurred over the course of four consecutive weeks and the parties called a total of twenty-two witnesses.

Dr. Roth testified that he and Dr. Vingan built NJBSC, and that, at that time of trial, the group consisted of twelve neurosurgeons. While many of the doctors in NJBSC had been trained to use the Gamma Knife, Dr. Kaptain and Dr. Lee were the two subspecialists who used it for procedures. The doctors who primarily operated the biplane were Dr. Walzman and Dr. Karimi. Dr. Roth

described ED calls as "essential," because it assists plaintiffs in acquiring patients and helps them develop referral networks from other physicians.

NJBSC doctors had ED call privileges at Hackensack, Holy Name, Pascack Valley, and Valley Hospital. Prior to joining Valley Hospital, Dr. Roth held privileges at Hackensack, Pascack, and Holy Name Hospitals. At "one point or another," Dr. Roth served as the chair of the department of neurosurgery at each of these hospitals, meaning that he managed the department.

Dr. Roth explained that there are different types of privileges granted to doctors, and that the "concept of privileges is an evolution because as technology comes and training becomes specialized, privileges change." For the most part, neurosurgeons in hospitals are given "core privileges," which are basic actions pertaining to their practice, such as "taking out a hemorrhage in the brain or taking out a herniated disk in the spine." There are additional admitting privileges, which allow a doctor to admit a patient from their office practice into the hospital if necessary. Doctors may also receive sub-privileges within different disciplines, such as using the biplane and Gamma Knife.

Meyers, Bhavasar, Callandrillo, and Dr. D'Ambrosio all testified that it was common for specialists to have privileges at other hospitals and to see patients at those other hospitals, and that there was no violation of Valley

30

Hospital rules by doing so. Callandrillo similarly explained that loyalty to a hospital is not a relevant factor in determining whether to remove someone's privileges and claimed she did not know or remember why she included this fact in the White Paper.

In a portion of Goldfischer's deposition that was read into the record at trial, she agreed that doctors who had privileges at Valley Hospital had a right to treat patients at other institutions where they had privileges and to hold titles at those other hospitals as well. She further testified, however, that leadership positions at other hospitals may have an impact on "potentially other arrangements." Goldfischer explained that if somebody held "a leadership position at an institution, they owe a duty of loyalty to that institution and not to other hospitals where they may have privileges, and that could potentially impact their decision on where to treat patients."

During Callandrillo's deposition, which was also read into the record at trial, counsel asked whether she cared that Dr. Walzman had a title at Hackensack. She responded, "We didn't care, it just confirmed what we'd known all along, that we didn't have a good relationship" with NJBSC; nevertheless, she agreed that Dr. Walzman taking a leadership position at Hackensack was not a basis for terminating his privileges or ED call participation at Valley Hospital

 A-2866-19

– but when counsel asked her to explain why she included in the White Paper that six of the nine physicians from NJBSC held titles at Hackensack, she responded she did not know or remember why it was included.

Callandrillo confirmed that both Columbia Group and NJBSC held privileges and titles at other hospitals. When asked that, because both groups held privileges and titles, "it wouldn't appear then to be relevant to the analysis of whether to take someone's privileges away[?]" Callandrillo responded, "It speaks to their loyalty."

Dr. D'Ambrosio testified at his deposition, which was played at trial, that the purpose of his January 13, 2015, meeting with Meyers "was to discuss whether or not we would be interested in an exclusive contract." However, by January 16, 2014, Dr. D'Ambrosio had already retained counsel, J. Anthony Manger, to represent the Columbia Group in discussions with Valley Hospital regarding an exclusive contract. In an email dated January 16, 2015, Manger emailed Goldfischer requesting that she call him back to discuss the conversation Dr. D'Ambrosio had with Meyers "about an exclusive contract between Valley [Hospital]" and the Columbia Group.

On February 26, 2015, Manger, Meyers, Goldfischer, Callandrillo, Valley's outside counsel, Dr. D'Ambrosio and two other Columbia Group

doctors met to discuss "closure" of the medical staff with neurosurgery. Manger agreed that the meeting ended with "the basic understanding between the parties . . . that they wanted to proceed with exploring some type of exclusive agreement." Dr. D'Ambrosio testified that at the end of the meeting, he believed that Valley Hospital would be "putting together a draft agreement and forwarding it" to Manger. At her deposition, which was read into the record, Goldfischer additionally clarified that when she said "close the service" in an October 31, 2014, email to Meyers, she meant "enter into an exclusive contractual arrangement" with Columbia Group.

Additionally, Goldfischer testified that she told Meyer that they needed to "paper this carefully," because she knew they had to document it since "the study is what's going to be looked at to determine whether we had a valid basis for determining this was in the best interest of patient care and a reasonable decision based upon the information we had."

John Albohm, a member of the Board and the Staff Development Committee, testified at trial that Callandrillo did not make him aware that she had any communications with Columbia Group prior to February 27, 2015, the date she allegedly began work on the White Paper. To Albohm's understanding as a member of the Staff Development Committee, he "fully expect[ed]" that the

33

study was going to be an objective analysis of the two groups. At the time the study started, he understood "it was an objective study and there had been no predetermined decisions as to who to go with."

While the White Paper showed that the NJBSC doctors were mostly all below 0.5 standard deviation from the mean in its neurosurgeon quality care analysis, at trial, plaintiffs' counsel drew attention to an email and attached report from Brennan to Callandrillo on August 27, 2015, with an "updated" analysis for five of the Columbia Group doctors, where that quality analysis showed that the Columbia Group doctors were below 0.5 standard deviation from the mean as well. That document was entered into evidence and the plaintiffs' counsel questioned Brennan about it at trial. She testified that the report showed one of the Columbia Group doctors was in the green, two were in the yellow, and two were in the red.

Brennan confirmed at trial that an email showed Callandrillo asked her to rerun the leakage report "for just those doctors [who] are dedicated to Valley Hospital" because she wanted to "add that so the [B]oard can compare leakage between the two groups." Brennan sent Callandrillo another report for November 2013 to October 2014, and it had fewer doctors from Columbia Group included in the report, and resulted in a lower amount of leakage attributed to

34

that group. Brennan could not recall why five Columbia Group doctors were removed from the follow-up report.

At trial, plaintiffs' counsel questioned Brennan about her April 13, 2015 email exchange with Grebowiec, where she referred to data "for building [a] case to align with neurosurgeon group" and that the "analysis shows the data on the group we do not want to align with." She confirmed that "the group we do not want to align with" referred to NJBSC. However, she further testified that the data was "a fictionalized version of the White Paper or not even of the White Paper," but a "fictionalized version of what we have the capability to do in" Crimson. Brennan explained that the presentation that contained the data referenced in the email was a fictionalized case study for educational purposes, although the White Paper "might have been the starting point," but was "not where it ended up."

Additionally, for the eighteen clinical trials that the White Paper showed were held by doctors in the Columbia Group, Dr. D'Ambrosio had provided Callandrillo that information at her request. In a portion of Callandrillo's videoed deposition that was played for the jury, she testified she received the information about NJBSC's number of trials from the clinical trials office, rather than from NJBSC directly, and that she received that information verbally

without underlying documentation. She also testified that she received a document showing that Dr. Walzman actually had more than one open trial after the report was completed, and that she advised Goldfischer and Meyers of that, but she did not correct the White Paper.

After the trial judge entered final judgment on February 6, 2020, Valley Hospital filed this appeal, presenting the following points of argument:

> I. BECAUSE PLAINTIFFS COULD NOT SHOW THAT VALLEY DEPRIVED THEM OF ANY REASONABLE EXPECTATION ARISING FROM THE MEDICAL STAFF BYLAWS, THE IMPLIED COVENANT CLAIM SHOULD NOT HAVE GONE TO THE JURY AND THE RESULTING VERDICT IS UNSUSTAINABLE.
>
> II. THE TRIAL BELOW WAS HOPELESSLY TAINTED BECAUSE THE MOTION COURT ERRONEOUSLY ORDERED THE PRODUCTION OF HUNDREDS OF PAGES OF PRIVILEGED COMMUNICATIONS, WHICH BECAME THE CENTERPIECE OF PLAINTIFFS' TRIAL STRATEGY.
>
> III. THE GROSSLY EXCESSIVE DAMAGES AWARD OF $24.3 MILLION WAS THE RESULT OF MULTIPLE ERRORS AND MUST BE SET ASIDE.
>
> IV. THE TRIAL COURT'S ERRORS BELOW CONSTITUTED ABUSES OF DISCRETION THAT CUMULATIVELY REQUIRE REVERSAL AND A NEW TRIAL.

A-2866-19

V. THE TRIAL COURT ERRED BY GRANTING
OFFER OF JUDGMENT AWARDS.


II.

A.

Valley Hospital alleges errors in both the summary judgment and post-trial stages in connection with the implied covenant of good faith and fair dealing claim. It first argues that the trial judge erred in denying its motion for summary judgment on that claim because it was a duplicate of the plaintiffs' breach of contract claim. It additionally asserts that the trial judge should have granted its motion for JNOV or for a new trial because it did not deprive the plaintiffs of any reasonable expectations under the Bylaws. Third, Valley Hospital contends that affirming the jury verdict would alter the current jurisprudence governing the judicial review of hospital administrative decisions.

<u>Motion for Summary Judgment</u>

Valley Hospital challenges only one aspect of the trial court's denial of summary judgment, namely that the implied covenant claim should have been dismissed on summary judgment.

A-2866-19

On November 15, 2018, the trial judge issued an order and written opinion granting summary judgment as to the contract claims against the Board and Meyers because plaintiffs did not have a contract with the Board or Meyers.

The trial judge also dismissed the claim that the Board and Meyers exercised invalid discretionary healthcare powers because the record did not support that they "made their decisions regarding the [e]xclusivity [a]greement in an unreasonable manner." The judge additionally dismissed the claim as to all Valley Hospital defendants that Valley Hospital's entry into the exclusive agreement with Columbia Group constituted tortious interference with prospective economic advantage. The judge found that the individual Valley Hospital defendants acted rationally and routinely when they aligned with Columbia Group because the action sought to "further Valley Hospital's longstanding alignment strategy to improve patient care and economic efficiency."

The trial judge dismissed the claims against Columbia Group for tortious interference with contract and tortious interference with prospective economic benefit, finding that plaintiffs failed to provide the evidence required to support either claim. While noting that Columbia Group and NJBSC are competing neurosurgical groups, the judge held that NJBSC "fail[ed] to establish that

A-2866-19

Columbia Group, a direct competitor, made any false, fraudulent statements concerning NJBSC, or did anything that would otherwise consist of wrongful conduct sufficient to establish claims for tortious interference."

Lastly, the trial judge concluded NJBSC's tortious interference claims against Valley Hospital failed because NJBSC "did not have a reasonable expectation of economic advantage" since it did not have any "contractual entitlement or expectation of ED calls at" Valley Hospital. The judge found that the record showed there "was never the type of protectable business relationship required to sustain a claim for tortious interference."

Valley Hospital argues that plaintiffs' claim for a breach of the implied covenant of good faith and fair dealing should not have gone to the jury and requires reversal. Specifically, Valley Hospital contends that the alleged conduct forming the basis of the implied covenant claim also formed the basis for the plaintiffs' breach of contract claim and sought the same remedies, and thus, should have been dismissed on summary judgment as a matter of law.

Plaintiffs pleaded a breach of contract claim in count three of their amended complaint. That count alleged that the Bylaws bound Valley Hospital defendants "to an objective standard relative to the renewal of existing privileges, including a hearing process, which must take place prior to" the

removal or curtailing of clinical privileges. It further alleged that the Valley Hospital defendants breached the Bylaws that addressed the reappointment of NJBSC's doctors and/or their change in status at the hospital. It quoted paragraphs from the Bylaws that pertained to the appointing and reappointing of medical staff membership; affording clinical privileges; and the hearing process for applicants who sought medical staff membership but received an adverse recommendation. Plaintiffs alleged that the Valley Hospital defendants did not abide by the Bylaws relating to "[c]hange in [s]tatus" because they "unilaterally" sought to terminate plaintiffs' privileges by entering into the exclusive agreement and denied plaintiffs their right to a hearing.

Additionally, plaintiffs pleaded a claim for breach of the implied covenant of good faith and fair dealing in count four, alleging that the Valley Hospital defendants were "bound to exercise their discretion reasonably with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with reasonable expectations of parties."

We review a summary judgment order de novo and thus apply the same standard as the trial court. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014). Summary judgment must be granted "when the record demonstrates that 'there is no genuine issue as to any material fact challenged and that the

40

moving party is entitled to a judgment or order as a matter of law.'"  Ibid. (quoting R. 4:46-2(c)).  The trial court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).  "[W]hen the evidence is so one-sided that one party must prevail as a matter of law," then the court properly granted summary judgment. Davis, 219 N.J. at 406 (quoting Brill, 142 N.J. at 540).

New Jersey courts recognize that every contract contains an implied covenant of good faith and fair dealing.  Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 109 (2007); Sons of Thunder, In Thunder c. v. Borden, Inc., 148 N.J. 396, 420 (1997).  That implied covenant prevents either party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Ass'n Grp. Life, Inc. v. Catholic War Veterans of U.S., 61 N.J. 150, 153 (1972).

However, this implied duty of fair dealing does not "alter the terms of a written agreement."  Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 366 (1992).  It also does not provide a plaintiff with additional damages for

the breach of an express term of a contract. <u>Wade v. Kessler Inst.</u>, 172 N.J. 327, 343-44 (2002) (stating a plaintiff's pleading erroneously suggested that a defendant "breaching a literal term of the [contract]," could "also could be found separately liable for breaching the implied covenant of good faith and fair dealing when the two asserted breaches basically rest on the same conduct").

In <u>Wade</u>, the plaintiff's termination was governed by an express term in an employee manual, and the plaintiff's allegation that she was dismissed without just cause "in effect rais[ed] the question whether defendant's firing of plaintiff constituted a breach of the manual's discharge provision." <u>Id.</u> at 344. The Court thus held that the "jury should have resolved that question within the framework of an alleged breach of a literal term, not as a violation of the implied covenant." <u>Ibid.</u>

Here, although the requested relief following the two counts is the same and includes a request for a hearing, the two counts are not duplicative and rest on different underlying conduct. The implied covenant claim could be read to be based upon Valley Hospital's alleged animosity towards plaintiffs for their significant association with Hackensack, a rival of Valley Hospital, which led to plaintiffs being deprived of their reasonable expectations under the Bylaws. Additionally, as those reasonable expectations were not express terms within the

42

contract, the breach of contract claim would not subsume the implied covenant claim, as occurred in Wade.

Post-Trial Motions

Valley Hospital argues that the jury's verdict should be vacated because the jury's finding that it breached the implied covenant is unsupported by the record, law, and public policy. Specifically, Valley Hospital asserts that: 1) at trial, the plaintiffs did not establish that Valley Hospital deprived them of any right or expectation under the Bylaws; and 2) allowing the jury's verdict to stand would alter the standard of review for hospital managerial decisions.

After the jury's verdict, Valley Hospital filed a motion for JNOV, or in the alternative, for a new trial or remittitur. At oral argument, Valley Hospital argued that the jury erred in finding that a breach of the implied covenant occurred because the claim was "an impermissible duplication of the breach of contract claim," which the jury rejected, and because plaintiffs failed to establish a connection between the alleged bad faith and a specific contractual right.

In a written decision dated December 2, 2019, the trial judge denied Valley Hospital's motion, finding that it failed to prove the jury committed a miscarriage of justice under Rule 4:49-1. The judge rejected Valley Hospital's argument that the claim was "an impermissible duplication of the breach of

43

contract claim," because the jury charges were "crafted with input from both parties and" neither party objected to the charge. The judge held that the law does not require a plaintiff to establish a connection between the bad faith and a specific contractual right; rather, "a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." (quoting Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc., 69 N.J. 123, 130 (1976)).

The judge found there was sufficient evidence presented at trial for the jury to find that Valley Hospital "acted in bad faith and engaged in conduct that enjoined [plaintiffs] from the benefit of the original bargain." The judge noted that the jury heard testimony "from multiple witnesses regarding the history of the relationship between the two parties and the extent of that relationship – which went beyond the bounds of the [B]ylaws." The judge determined that the "jury was within its rights to find that [plaintiffs] had a reasonable expectation of continuing this relationship with [Valley Hospital] in much the same way as it had since 2005."

The judge further noted that both sides presented testimony and evidence as to the study conducted by the Valley Hospital defendants, which Valley Hospital claimed justified the revocation of the privileges of NJBSC doctors.

Plaintiffs presented evidence that the Valley Hospital defendants "made a predetermined decision to revoke the privileges, such as [Valley Hospital's] own general counsel indicating that they needed to build 'a strong case ahead of time.'" The court stated that Valley Hospital had "ample opportunity" to rebut these allegations, cross-examine, and present its own case.

Therefore, the judge concluded that the jury's determination that Valley Hospital's actions were a pretext did not "fall into the category of 'uncontradicted testimony [that] is so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinary intelligent mind, th[at] a question has been presented for the court to decide and not the jury." (quoting Frugis v. Bracigliano, 177 N.J. 250, 270 (2003)).

The trial court applies the same standard when deciding a motion for JNOV, pursuant to Rule 4:40-2, as it does when considering a motion for involuntary dismissal under Rule 4:37-2(b). Dolson v. Anastasia, 55 N.J. 2, 5 (1969). The issue for it to determine is whether the "evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2(b). The court's function is mechanical and it "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson,

A-2866-19

55 N.J. at 5-6. We review the trial court's decision applying the same standard. Lewis v. Am. Cyanamid Co., 155 N.J. 544, 567 (1998).

Additionally, a trial judge shall not grant a new trial and reverse a jury verdict unless, "having given due regard to the opportunity of the jury to pass upon the credibility of the witness, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). A miscarriage of justice occurs when there is a "pervading sense of 'wrongness' needed to justify [an] appellate or trial judge undoing of a jury verdict . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result . . . ." Risko v. Thompson Muller Auto. Grp., 206 N.J. 506, 521-22 (2011) (alterations in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).

We use the same standard as the trial court when reviewing the denial of a motion for new trial. R. 2:10-1; Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 52 (2009). Thus, we will not reverse a jury verdict "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. However, we must defer to the trial court's views on "witness credibility," "demeanor," "feel of the case," and other intangible aspects that are "not

46

transmitted by the written record." Dolson, 55 N.J. at 6. Nevertheless, there is no deference given to the trial court when "it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record." Id. at 7.

## 1. Waiver Argument

As a threshold matter, plaintiffs first argue that Valley Hospital waived its arguments for overturning the trial court's denial of the JNOV because Valley did not make a motion for judgment during trial, pursuant to Rule 4:40-2.

Under Rule 4:40-2, the court cannot enter a JNOV "unless a motion for judgment or its equivalent has been made during trial." Velazquez v. Jiminez, 336 N.J. Super. 10, 33 (App. Div. 2000). The initial motion need not be a motion for judgment, as long as the motion would have afforded the same relief sought by the party by way of the JNOV. Logan v. N. Brunswick Twp., 129 N.J. Super. 105, 108-09 (App. Div. 1974) (finding a motion for summary judgment was equivalent to a motion for judgment on a liability issue because the summary judgment sought to strike the defense of contributory negligence). If a summary judgment motion did not address the same issue as the JNOV motion, it does not preserve the right to move for JNOV relief. Velazquez, 336 N.J. Super. at 34.

Valley Hospital argues that its summary judgment motion was equivalent to a motion at trial because it asserted the same arguments as in its JNOV motion: that the implied covenant claim was duplicative of the breach of contract claim and that the claim was not tethered to an actual right in the contract. We are satisfied that Valley Hospital did not waive its motion for JNOV by failing to make a motion for judgment at trial. The summary judgment motion fulfilled the purpose of Rule 4:40-2 because Valley Hospital made the earlier motion on the same legal grounds as its motion for JNOV. Ibid.

2. Reasonable Expectation Under the Contract

Valley Hospital argues that the trial judge should have vacated the jury's verdict because, at trial, the plaintiffs failed to show that Valley Hospital deprived them of a right or expectation under the Bylaws, as required for an implied covenant claim. Valley Hospital asserts that the Bylaws did not provide the plaintiffs with the reasonable expectation or a contractual right to ED calls or to use the Gamma Knife or biplane, and an implied covenant claim cannot create new rights that do not otherwise exist.

New Jersey courts have applied the implied covenant of good faith and fair dealing "in three general ways": 1) to allow "the inclusion of terms and conditions which have not been expressly set forth in the written contract"; 2)

"to allow redress for the bad faith performance of an agreement even when the defendant has not breached any express term"; and 3) "to permit inquiry into a party's exercise of discretion expressly granted by a contract's terms." Seidenberg v. Summit Bank, 348 N.J. Super. 243, 257 (App. Div. 2002).

"Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Brunswick Hills Racquet Club, Inc. v. Rt. 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005) (quoting Wilson, 168 N.J. at 245). The party asserting a breach of implied covenant claim "must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." Id. at 225 (citation omitted).

Nonetheless, a defendant can be liable for a breach of the implied covenant even "without violating an express term of a contract." Sons of Thunder, 148 N.J. at 422-23. Indeed, a "plaintiff may be entitled to relief under the covenant if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose." Brunswick Hills, 182 N.J. at 226. The plaintiff may also "get relief if it relies to its detriment on a defendant's intentionally misleading assertions." Ibid.

A-2866-19

Our Supreme Court has acknowledged that it is "mindful of the potential pitfalls in enforcing the covenant of good faith and fair dealing," and that if it is construed "too broadly, it 'could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements.'" Brunswick Hills, 182 N.J. at 231 (quoting Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000)). The Court further "warned that 'an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive.'" Ibid. (quoting Wade, 172 N.J. at 341).

In Brunswick Hills, the plaintiff was a tenant who attempted to exercise its contractual option to extend its lease another ninety-nine years. 182 N.J. at 229. The defendant-landlord, however, "preferred to watch the option die," and, thus, engaged in "a series of evasions and delays, that lulled plaintiff into believing it had exercised the lease option properly." Id. at 229, 231. The Court found that the defendant had "engaged in a pattern of evasion, sidestepping every request by plaintiff to discuss the option and ignoring plaintiff's repeated written and verbal entreaties to move forward on closing the ninety-nine[-]year

lease." Id. at 229. It therefore concluded that the defendant had breached the implied covenant. Ibid.

Additionally, in Bak-A-Lum Corp., 69 N.J. at 126, the Court applied the implied covenant where the defendant had given the plaintiff exclusive rights to distribute aluminum siding within a specific region. The defendant had decided to terminate the plaintiff's exclusive distribution rights and add other distributors to its specified territory, but did not inform the plaintiff. Id. at 127. The plaintiff "undertook a major expansion of its warehouse facilities at a substantial added operating expense" and signed a five-year lease for more space. Ibid. According to the plaintiff, the defendant was aware of the plaintiff's actions and had even encouraged them. Ibid. The Court concluded that although there was no "literal" breach of the contract's express terms, the defendant breached the implied covenant by withholding from the plaintiff its intent "seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation . . . ." Id. at 130.

Here, Valley Hospital argues that plaintiffs' only reasonable expectation under the Bylaws "was to be treated the same way as any other member of Valley Hospital's Medical Staff," because the Bylaws were "not a commercial contract

uniquely negotiated to suit Plaintiffs' needs and expectations," but applied to all medical staff.

Moreover, Valley Hospital points to the instructions given to the jury on the implied covenant claim in support of its argument because the charge "never mentioned the Medical Staff Bylaws, which is the only 'contract' at issue." Valley Hospital does not challenge these instructions on appeal, but appears to cite them to illustrate that plaintiffs described their implied covenant claim as Valley Hospital having encouraged them to "invest time, resources, and efforts to modernize the practice of neurosurgery at Valley [Hospital], but then unfairly and dishonestly barr[ed] plaintiffs from using the tools and facilities they developed."

In the trial judge's instructions to the jury for the breach of the implied covenant of good faith and fair dealing, it stated:

> [Plaintiffs] in this case claim[] that the defendant Valley [Hospital] breached the implied covenant [of] good faith and fair dealing by encouraging plaintiffs to join Valley [Hospital] and take over the Emergency Department call schedule, invest time, resources, and efforts to modernize the practice of neurosurgery at Valley [Hospital], but then unfairly and dishonestly barring plaintiffs from using the tools and facilities they developed.
>
> Plaintiffs further contend that Valley [Hospital] breached the covenant of good faith by making a

52

predetermined decision to exclude plaintiffs creating a sham study by changing metrics to achieve its intended goal of skewing [plaintiffs'] results to show poor quality and negotiated contract with [Columbia] Group before the study even began.

The judge then instructed the jury on each of the three elements that plaintiffs needed to prove to prevail on this claim, summarizing them as follows:

In summary, if you find that the [plaintiffs have] proven by a preponderance of the evidence, one, the existence of some type of contract, two, that the defendant although acting consistently with the contract's terms acted in bad faith with the intent to deprive the plaintiff[s] of [their] reasonable expectations under the contract, and, three, the plaintiff[s] sustained loss as a result of such action, then you must find for the plaintiff[s].

On that same day as the judge's charge, the jury returned its verdict, finding that Valley Hospital and plaintiffs had entered into a contract, but that terminating the services without a hearing was not a breach. The jury further found, however, that Valley Hospital "violated the covenant of good faith and fair dealing with the purpose of depriving the [plaintiffs] of their reasonably expected rights or benefits under the contract."

We are satisfied the evidence supports the jury's verdict finding Valley Hospital liable. We discern no miscarriage of justice. As the trial judge identified in his decision denying a new trial, there was testimony that supported

the finding that Valley Hospital and plaintiffs' relationship had extended "beyond the bounds of the bylaws" and therefore the jury could find that plaintiffs had a reasonable expectation of that relationship continuing as it had been since 2005. The jury could have found that Goldfischer's email, stating that they needed to build "a strong case ahead of time," supported plaintiffs' position that Valley Hospital conducted this study as a "sham" to limit plaintiffs' privileges in favor of the Columbia Group.

Additionally, the jury heard Dr. Roth's testimony as to how plaintiffs came to join Valley Hospital's medical staff, and his understanding that they would help modernize the hospital's neurosurgical department so that patients could receive treatment without being transported to a hospital in New York City. He also testified that NJBSC hired additional subspecialists and grew their practice, moved their offices, and invested time in helping Valley Hospital obtain and use the biplane. The jury heard Dr. Roth's testimony that he believed that the ED call would remain part of NJBSC's practice "forever."

While plaintiffs' rights to the biplane and Gamma Knife were not explicitly listed in the Bylaws because they are a general contract for all medical staff and not specific to plaintiffs, and provided that the ED call "may be removed," the Bylaws provided the mechanism for granting privileges to the

medical staff in order for them to treat patients at the hospital. Similar to Bak-A-Lum and Brunswick Hills, while Valley Hospital may not have breached an explicit term in the Bylaws, the record contains support for the jury's finding that Valley Hospital acted with ill motives and without legitimate purpose, in preparing the White Paper study that led to the revocation of plaintiffs' privileges. To acquire and treat patients, plaintiffs used the ED call, biplane, and Gamma Knife, and these were benefits that plaintiffs relied upon and reasonably expected would continue when they expanded their practice to support Valley Hospital's goal of becoming a Neurological Center of Excellence. The evidence presented at trial supports a finding that NJBSC sought those privileges because of Valley Hospital's solicitation of the group to help improve care at Valley Hospital, particularly in its ED.

In sum, we affirm the trial judge's denial of Valley Hospital's motion for a new trial, as the record does not show there was a miscarriage of justice. We also affirm the judge's rulings as to the claim for breach of implied covenant of good faith and fair dealing on summary judgment and at the end of trial.

## B.

Valley Hospital argues that the trial was "hopelessly tainted" because the Chancery Court granted plaintiffs' motion to compel, when in fact those

documents were privileged and had been originally produced by Valley Hospital to plaintiffs inadvertently. We disagree.

After hearing oral argument, the judge issued a written decision dated May 16, 2016, granting plaintiffs' motion to compel the production of certain discoverable documents. The judge summarized that plaintiffs claimed they discovered evidence that the Valley Hospital defendants' study was a "sham." Specifically, plaintiffs identified 352 emails that they alleged demonstrated "the pre-textual nature of the [White Paper]."

While the judge rejected application of the "crime or fraud" exception that would have allowed plaintiffs to retain the documents, he did find that Valley Hospital "waived the attorney-client privilege relating to communications surrounding the study" by relying on the study. The judge found that the Valley Hospital defendants put the study into issue and that it formed the "main crux of their defense."

The judge further found that the Valley Hospital defendants' disclosure of the privileged material was a waiver, under Ciba-Geigy Corp. v. Sandoz, Ltd., 916 F. Supp. 404, 411 (D.N.J. 1995). The court placed "much weight [on] the fact that the emails had already been disclosed" to plaintiffs at the time of the motion. The documents also had been marked with a designated level of

confidentiality, which the court found "implie[d] review of the documents rather than inadvertent disclosure." Further contributing to the judge's reasoning was the "voluminous disclosure," totaling 352 emails, as well as the fact that the Valley Hospital defendants' efforts to claw back the documents occurred "some time after the disclosure." Moreover, the judge noted that the Valley Hospital defendants "conceded" at oral argument that many of the documents were discoverable.

Therefore, the judge concluded that Valley Hospital's disclosure "constituted a waiver, as it occurred following some review, and there was a voluminous disclosure." The judge therefore granted plaintiffs' motion and ordered that they be permitted to retain the subject documents.

The judge likewise denied the Valley Hospital defendants' motion for reconsideration. In a written decision, the judge found that the Valley Hospital defendants failed to show that his original decision was incorrect or irrational. In his decision, the judge further explained that in finding "in-issue waiver," he had relied on our decision in United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 567 (App. Div. 1984), where we discussed the inequity of a party using the privilege as both a sword and a shield  The judge stated that Goldfischer "was the study's genesis," and that she was the one "who expressed a need for the

study and who guided its creation." Thus, the judge found that the Valley Hospital defendants could not "now claim, having offered the study as the reason for their conduct towards [p]laintiffs, that communications about the study with Ms. Goldfischer are privileged."

On appeal, Valley Hospital argues that the court's decision constitutes an abuse of discretion, contending that the court erred in finding that Valley Hospital put the communications into issue and that the production of the emails waived the privilege. Plaintiffs argue that the motion was correctly decided, and further assert assert that Valley Hospital waived its right to appeal this discovery issue by not objecting to the admission of the documents at trial.

We "generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011) (quoting Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005)). We likewise review an order for a motion for reconsideration for an abuse of discretion. Brunt v. Bd. of Trs., Police, & Firemen's Ret. Sys., 455 N.J. Super. 357, 362 (App. Div. 2018).

Valley Hospital contends the emails were protected from disclosure under the attorney-client privilege. Whether the attorney-client privilege applies is a

legal issue and is reviewed de novo. Paff v. Div. of L., 412 N.J. Super. 140, 149 (App. Div. 2010).

We first address plaintiffs' argument that Valley Hospital waived its right to appeal this discovery issue by not objecting to the admission of the documents at trial. We disagree. Valley Hospital made clear its objections to the judge's finding that it had waived its privilege to the specific documents. Although Valley Hospital did not specifically object to the admission of the evidence at trial, the facts of the case satisfy the policy behind Rule 1:7-2, which requires timely objections. See Waterson v. Gen. Motors Corp., 111 N.J. 238, 249-50 (1988) (finding no waiver where plaintiff challenged the admissibility of seat belt testimony at a pretrial hearing but did not object to the testimony at trial). The court had the chance to address the objection and Valley Hospital's issues with the waiver of privilege during two pretrial motions. The arguments were briefed and argued by both sides and the court issued two written decisions on the issue. Therefore, we find no waiver of this argument occurred.

The attorney-client privilege safeguards communications between lawyers and their clients "in the course of that relationship and in professional confidence . . . ." N.J.S.A. 2A:84A-20(1); N.J.R.E. 504(1). The privilege applies to the following: 1) communications "in which legal advice is sought";

2) communications "from an attorney acting in his [or her] capacity as a legal advisor"; 3) where the "communication is made in confidence"; and 4) communications made by the client. Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013). The client holds the privilege and the client or the lawyer may claim the privilege. Ibid.

A party may also waive the privilege either explicitly or implicitly. State v. Mauti, 208 N.J. 519, 532 (2012). Our Supreme Court has explained that a party may waive the privilege by raising the subject of the privileged documents as an affirmative defense. Payton v. N.J. Tpk. Auth., 148 N.J. 524, 552-53 (1997). "A party may not abuse a privilege, including the attorney-client privilege, by asserting a claim or defense and then refusing to provide the information underlying that claim or defense based on the privilege." Id. at 553.

In Wolosoff, 196 N.J. Super. at 567, we reasoned that if a party could use the privilege "as a sword rather than a shield," then the party could "divulge whatever information is favorable to its position and assert the privilege to preclude disclosure of the detrimental facts." We therefore held that "when confidential communications are made a material issue in a judicial proceeding, fairness demands waiver of privilege." Ibid. (quoting United States v. Mierzwicki, 500 F. Supp. 1331, 1335 (D. Md. 1980)).

Here, Valley Hospital contends that this case is different than the situations we anticipated in <u>Wolosoff</u> because the Valley Hospital never sought to rely on any of the privileged material. Valley Hospital asserts that it relied on the White Paper to support its argument that it had adequately studied the impact of entering into an exclusive agreement with the Columbia Group and redacted any privileged material within that study. We are not persuaded.

We conclude the judge did not abuse its discretion in finding that Valley Hospital put the documents in-issue and thus waived any privilege. Although Valley Hospital argues that it did not intend to rely on privileged sections of the White Paper, it used the White Paper to show that it studied the impact of the exclusive agreement, and that the result of the study supported entering into the exclusive agreement with Columbia Group. As the judge noted, denying the motion to compel would have resulted in Valley Hospital being able to use the White Paper as both a sword and a shield. <u>Wolosoff</u>, 196 N.J. Super. at 567. Goldfischer – Valley Hospital's counsel – suggested the study, supported the idea of the study, and was involved in its creation. Like <u>Payton</u>, the fact that counsel partook in the investigation, or in this case the formulation of the study, does not excuse it from the in-issue waiver when the privileged document is a central part of the case.

A-2866-19

Valley Hospital contended that the White Paper was a legitimate, unbiased study that justified its decision to enter into the exclusive agreement with Columbia Group; thus, as in Payton, it waived any applicable attorney-client privilege to certain documents relating to the challenged action. Valley Hospital held up the White Paper as legitimate reasoning for its decision; however, at trial, plaintiffs presented substantial evidence to show that Valley Hospital had a motive to choose Columbia Group over them and that Valley Hospital unfairly manipulated the data to support its preferred outcome.

Because we find the judge did not abuse his discretion in finding that Valley Hospital waived its privilege by placing the White Paper in-issue, we do not reach Valley Hospital's alternative argument that it did not waive the privilege because it was an inadvertent disclosure.

## C.

Valley Hospital appeals the $24.3 million awarded in lost profit damages, asserting the trial court committed error by:  1) "permitting unreliable testimony from [p]laintiffs' damages expert, who merely assumed that Valley [Hospital's] . . . [exclusive agreement with Columbia Group] was the cause of [NJBSC's] asserted business losses"; 2) "precluding Valley [Hospital's] expert from presenting a full rebuttal on the issue of causation"; and 3) "refusing to exclude

from the jury award lost profits damages resulting from [NJBSC]'s loss of the ED call."

Plaintiffs' Damages Expert

Valley Hospital argues that the testimony of plaintiffs' damages expert, Kevin Clancy, was not a "true calculation of lost profits," contending that Clancy just compared NJBSC's profits at Valley Hospital before and after the hospital entered into the exclusive agreement with Columbia Group. Valley Hospital asserts that Clancy's testimony lacked an "attempt to engage in any causation analysis that would link the business losses (or some share of those losses) to Valley Hospital's actions as opposed to other possible causes." As a result, Valley Hospital argues that Clancy's testimony "assumed without basis that every penny of the diminution" of NJBSC's profits resulted from Valley Hospital's exclusive agreement with the Columbia Group, "irrespective of industry trends, changes in the law, changes in the physicians['] practices and their aging, or mitigation efforts."

Trial Court's In Limine Decision and on Remittitur

On January 24, 2019, the trial judge considered Valley Hospital's motion in limine to bar Clancy's testimony on damages, which the judge denied. Valley

Hospital specified that its motion was a Daubert[7] motion, to which the judge responded that "Daubert was more of a case where there was scientific methodology" in question. The judge noted that Clancy was "really an accountant who's doing calculations . . . and he's not coming up with a new scientific theory or anything like that."

Valley Hospital responded that Clancy was indeed an accountant but was "certainly not a damages expert," and argued that Clancy had "no clue about what he was doing in terms of calculating lost profits damages." Valley Hospital requested the judge preclude Clancy as a witness, contending that Clancy did not take mitigation into account, nor did he causally relate the lost profits damages.

The trial judge rejected these arguments, stating that Valley Hospital would be able to cross-examine Clancy to demonstrate to the jury whether Clancy failed to take into account certain factors he should have considered when determining plaintiffs' damages. The judge explained that Daubert applies where an expert relies on scientific data that does not actually exist or is unproven, not where an expert allegedly failed to "take into account factors that he should have." The judge found that Clancy was "qualified as a [Certified

---

[7] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

Public Accountant] to give an opinion" and discuss how he made his calculations. He determined that the issues Valley Hospital had with Clancy's calculations went to the weight of the opinion, not whether he would be allowed to give an opinion. Reasoning that Clancy "had a why and wherefore and this is his methodology as an accountant," the judge denied the motion in limine to preclude Clancy from testifying.

Additionally, in his December 2, 2019 written decision denying remittitur, the judge rejected Valley Hospital's argument that Clancy "failed to consider any alternative causation as to the loss in profits experienced by" plaintiffs. The judge found that Valley Hospital "had ample opportunity to question Clancy as to what factors he considered and why he didn't consider other certain factors." The judge further found that Valley Hospital presented its own expert, who was free to provide alternative causes for plaintiffs' losses.

Clancy's Trial Testimony

Clancy testified that he is a financial advisor/accountant and a partner in an accounting/consulting tax firm, where he had practiced since 1999. Licensed as a CPA, he is a practice leader for the firm's restructuring and dispute resolution services practice. He also has been qualified as an expert in about a

A-2866-19

dozen other proceedings. Counsel for Valley Hospital stated he had no objection to Clancy's qualifications.

The judge found that Clancy was an "expert insofar as he's a certified public accountant," and that he "may give financial calculations and projections based on that education, training, and experience." The judge instructed Clancy that "any of these opinions that you're going to give, and any of these projections, must be within a reasonable degree of certainty" and not based on speculation.

On direct examination, Clancy testified that he prepared a report, dated May 2018, that summarized his findings and conclusions as to plaintiffs' lost profits. His total estimate of lost profits was $67.4 million. To do so, Clancy testified he first gathered financial information, such as tax returns and financial statements "to understand what the doctors' practice looked like historically to get a base line." Clancy specified that he relied on profit and loss statements for the years 2011-2017 for NJBSC, tax returns from 2010 to 2016, and Alteer billing and collection data, which was a program that detailed patient information as to the types of procedures the doctors performed and the charges for them.

A-2866-19

Clancy's first step was to quantify the "financial numbers associated with the relationship between the doctors' practice" and Valley Hospital. Since there was at least ten years of history, Clancy testified that "there was plenty of information to get a sense of how much volume patient-wise, as well as dollar amount that the doctors' practice was doing as a result of the relationship with Valley Hospital." To determine historical damages, Clancy isolated the dollars and profit that resulted from plaintiffs' relationship with Valley Hospital, from their business as a whole. To do this, Clancy identified the patients who either originated in Valley Hospital's emergency room or were referred to plaintiffs through their relationship with Valley Hospital.

Using the Alteer data, Clancy examined the cash collections for the years 2012, 2013, and 2014. He calculated that the average cash collections for the three years was $5,010,500 and those charges all related to Valley Hospital work. He referred to that amount as the "operating standard," meaning the "baseline historical" from the average of the years 2012, 2013, and 2014.

After determining the average cash collections for 2012-2014, Clancy testified his next step was to calculate the amount plaintiffs collected in 2016

67

and 2017, since Valley Hospital ended the relationship with them in 2016.[8] Clancy testified that the cash collections for 2016 amounted to $1,907,263, and in 2017 totaled $572,149.

Clancy calculated that the lost profits for 2016 totaled $2,327,090 by taking 2016's cash collections, comparing it to the operating standard, and then removing twenty-five percent of that amount for operating costs.[9]

For 2017, Clancy testified that the cash collection was $572,000, and was "a big drop-off, which you would expect because you're not seeing patients anymore." He took that amount and compared it to the operating standard, less the twenty-five percent cost of service, which yielded 2017 lost profits of $3,328,426. The total of 2016's and 2017's lost profits amounted to $5,655,516.

Clancy referred to that amount as "historical damages," since those years had already occurred. Thus, the lost profits for the two-year period were $5,655,516, and Clancy opined that "to a reasonable degree of probability based upon accepted standards for calculation of lost profits," plaintiffs suffered "a

---

[8] Clancy also had the data from 2015 and did not include that in the average from 2012-2014, because "based on the testimony and the facts as [he understood] them," the relationship "was already breaking down in 2015."

[9] Clancy explained that he examined the practice's tax returns and financial statements to determine that its operating costs historically amounted to twenty-five percent of their costs.

A-2866-19

loss as a result of the termination or reduction in certain rights to the ED and other clinical privileges for that period of time."

Clancy testified that this methodology was "a before and after approach," and compared the dollar amounts that had been generated from the relationship with Valley Hospital in the years prior to the dollar amount of today, and that difference would be the damages. In his opinion, this methodology was a generally accepted method of undertaking a lost profit calculation, and that "the most historical information that you have to rely upon as a baseline," is important as compared to a new business that is just starting and thus would not have a lot of history to rely upon.

Clancy additionally evaluated future lost profits, which consisted of him asking "what would have been the expectation if the relationship had kept on the way it was." He testified that the methodology generally accepted within the accounting field to determine the future lost profits involved looking at the income stream at that time and then asking "what is the likelihood" that it will continue going forward. "And so you project that year-over-year into the future and then you discount it backwards." The "multiple approach" involved determining the "discount factor," that is, "for every dollar in the future how much do I have to discount that to today's dollars." He then took that discount

rate and created a "multiple," which is "what is somebody willing to give me for this revenue stream into the future, and are they willing to pay me a certain dollar amount for that future revenue stream today."

Clancy testified that the professional guidelines required him "to look at the business and, based on the harm, [ask] is it ever going to recover what it lost." That assessment is "important because sometimes you may have a business that is harmed and it recovers within a year. You may have a business that loses an income stream and it will never get it back." However, he did not "see the income stream from Valley [Hospital] ever coming back to [plaintiffs'] practice." He compared the multiple for the practice to other doctors' practices in the industry, using primarily public company information "to get a sense of what other practices in this space trade as a multiple to other practices to come up with some goal posts as to a high and low." Clancy used the mid-range multiplier of 5.6 to calculate the post-2017 future damages as $18,639,185.

Thus, Clancy opined that within a reasonable degree of probability based on standards within his industry, the total of both 2017 the historical damages and post-2017 lost profits related to the removal of ED and other privileges at Valley Hospital was "approximately $24.3 million."

70                                                            A-2866-19

Clancy additionally testified that he also analyzed the lost profits related to the Valley Hospital ED visits. To do so, he isolated the cash collections from 2012, 2013, and 2014 in Alteer, and determined how much of that was from ED activity. The average cash collections for those years was $1,481,755. Clancy determined that the collections were trending up over that period of three years by approximately six percent, and so he calculated that if the six percent upwards trend had continued, in 2017, plaintiffs would have had a cash collection of $1,764,794. Subtracting the twenty-five percent operating costs from that amount and then using the 5.6 multiplier, Clancy calculated that the plaintiffs' future damages arising solely from the lost patient volume in Valley Hospital's ED amounted to $7,412,136.

Clancy further testified that he also looked at factors other than losing privileges at Valley Hospital and how that could have affected plaintiffs' profits. He noted that they had entered into an insurance contract with Horizon, which allowed them to get more patients, but decreased the payment they would receive for procedures. In 2016, NJBSC's cash collections were $43.4 million, and in 2017 were $35.4 million, showing a decline of approximately $8 million, or 18 percent, year-over-year. Clancy testified that the volume of patients increased by about four percent; however, the collections still decreased. He

71

calculated that, if the reimbursement rates did not drop by eighteen percent, then NJBSC's revenue for 2017 would have been approximately $43.1 million in total ($35.4 million divided by 82 percent) – or approximately $7.7 million higher.

On cross-examination, defense counsel questioned Clancy on his methodology, such as the multiple he used to calculate lost profits and mitigation efforts. Defense counsel highlighted for the jury, Clancy's methodology and the factors he considered when calculating declines in NJBSC's revenues. Clancy testified that he did not "consider any kind of industry trends that may have contributed to the decline of revenues." He also confirmed that he did not "consider the possibility that the ages of the doctors may have contributed to the decline in revenues."

On appeal, Valley Hospital reasserts on appeal that the trial judge failed to perform his gatekeeping duties by allowing Clancy to testify to the jury as to his lost profit calculations. It is well-established that we review evidentiary issues "under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). Trial courts are granted "broad discretion to determine both the relevance of the

evidence presented and whether its probative value is substantially outweighed by its prejudicial nature." Ibid. An abuse of discretion has occurred if there was a "'manifest error or injustice,'" or "'a clear error of judgment.'" Ibid. (citations omitted). Thus, reviewing courts "will reverse an evidentiary ruling only if it was so wide off the mark that a manifest denial of justice resulted." Ibid. (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

Expert witnesses are "qualified 'by knowledge, skill, experience, training, or education' and [are] therefore permitted to offer testimony in the form of an opinion that 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" State v. McLean, 205 N.J. 438, 449 (2011) (quoting N.J.R.E. 702).

Under N.J.R.E. 702 and N.J.R.E. 703, the trial court is "the gatekeeper of expert witness testimony." Morales-Hurtado v. Reinoso, 241 N.J. 590, 593 (2020) (quoting In re Accutane Litig., 234 N.J. Super. 340, 391 (2018)). N.J.R.E. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." There are three core requirements for the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that such an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
> [Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Creanga v. Jardal, 185 N.J. 345, 355 (2005)).]

N.J.R.E. 703 addresses the foundation for expert witness testimony, and "mandates that expert opinion be grounded in 'facts or data derived from the expert's personal observations, or (2) evidence admitted at trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Ibid. (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). A corollary to N.J.R.E. 703 is the net opinion rule, "which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Id. at 53-54 (quoting Polzo, 196 N.J. at 583).

While the net opinion rule requires experts "to provide the factual basis and analysis that support their opinion, rather than stating a mere conclusion," it "does not require experts to organize or support their own opinions in a specific manner 'that opposing counsel deems preferable.'" In re Civ. Commitment of A.Y., 458 N.J. Super. 147, 169 (App. Div. 2019) (quoting Townsend, 221 N.J. at 54). Trial courts should therefore not exclude expert

74

testimony "merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Ibid. (quoting Townsend, 221 N.J. at 54). If the expert "otherwise offers sufficient reasons which logically support his [or her] opinion," then the failure to consider or weigh a factor the adversary believes is important does not render the testimony an inadmissible net opinion. Ibid. In that instance, any omissions by the expert's testimony can be explored during cross-examination at trial. Ibid.

"Lost profits are one measure of compensatory damages that may be recoverable in a breach of contract action, if they can be established with a 'reasonable degree of certainty.'" RSB Lab. Servs., Inc. v. BSI, Corp., 368 N.J. Super. 540, 555 (App. Div. 2004) (quoting Stanley Co. of Am. v. Hercules Power Co., 16 N.J. 295, 314 (1954)). "Anticipated profits that are too remote, uncertain, or speculative are not recoverable." Desai v. Bd. of Adjustment of Town of Phillipsburg, 360 N.J. Super. 586, 595 (App. Div. 2003). "'Lost profits' signifies the difference between gross income and the costs or expenses which had to be expended to produce the income." Comartie v. Carteret Sav. & Loan, 277 N.J. Super. 88, 103 (App. Div. 1994). "To recover lost profits, a party must show that profits were lost as a result of the actionable conduct complained of." Ibid.

"Proof of the relevant costs or expenses is not a matter of mitigation. It is part of the damage case of the party seeking recovery for lost profits." Cromartie, 277 N.J. Super. at 103. Nonetheless, "[p]rofits lost by reason of breach of contract may be recovered 'if there are any criteria by which probable profits can be estimated with reasonable certainty.'" V.A.L. Floors, Inc. v. Westminster Comms., Inc., 355 N.J. Super. 416, 425 (App. Div. 2002).

Additionally, the "fact that a plaintiff may not be able to fix its [lost profits] damages with precision will not preclude recovery of damages." RSB, 368 N.J. Super. at 556 (alteration in original) (quoting V.A.L. Floors, Inc., 355 N.J. Super. at 425). In that case, the "[p]ast experience of an ongoing successful business provide[d] a reasonable basis for the computation of lost profits with a satisfactory degree of definiteness." Ibid.

As another threshold argument, plaintiffs assert that Valley Hospital waived any argument based on N.J.R.E. 703, because it asserted an argument that relied on N.J.R.E. 702 before the trial court. Plaintiffs contend the trial judge only issued a decision on the N.J.R.E. 702 Daubert motion, and not a decision on this "net opinion" argument Valley Hospital now asserts. They also argue that Valley Hospital failed to object to Clancy's testimony at trial.

In its reply brief, Valley Hospital clarified it does not assert that Clancy did not have factual evidence or failed to explain his reasoning, but rather, that "Clancy's methodology was unreliable because he did not consider causation." Valley Hospital argues that Clancy did not attempt to "determine causation beyond assuming blindly that [the hospital's exclusive agreement with Columbia Group was] the only thing that could have possibly caused a decrease in [the doctors'] revenue." The crux of its argument is that Clancy did not attempt to show plaintiffs' profits fell because of the Valley Hospital's actions, and instead only compared the pre- and post-agreement revenues.

Initially, we reject plaintiffs' argument that Valley Hospital waived an argument under N.J.R.E. 703. These arguments are not newly raised, but rather Valley Hospital asserted these same arguments before the trial judge on its motion in limine, when it moved to bar Clancy from testifying prior to the trial, which the trial judge rejected.

While we do not conclude that Valley Hospital waived its right to challenge Clancy's testimony, we conclude that its arguments challenging the testimony lack merit. Valley Hospital concedes that it is not challenging whether Clancy's evidence is fact-based nor asserting that he provided a net opinion, but whether his methodology was reliable because he did not consider

plaintiffs' ages, the economy, or other factors, besides the exclusive agreement, when accounting for the possible differences in revenues in the before and after the agreement. However, as the judge noted, this was more appropriate fodder for cross-examination. Indeed, on cross-examination, opposing counsel questioned and highlighted Clancy's omission of considering plaintiffs' ages.

We conclude the trial judge did not abuse his discretion in allowing Clancy's testimony and finding it admissible. The issues raised by Valley Hospital concern the weight of the evidence, rather than admissibility, and Valley Hospital's counsel had the opportunity and took advantage of that opportunity, to expose any flaws in Clancy's methodology.

Valley Hospital's Expert Witness

Valley Hospital next argues that the trial judge erred in barring Sam Rosenfarb, its expert witness on damages, from testifying about the Out-of-Network Consumer Protection, Transparency, Cost Containment, and Accountability Act (the Act), N.J.S.A. 26:2SS-1, and the impact that Rosenfarb believed it would have had on plaintiffs' profits.

Valley Hospital asserts that the Act would have affected plaintiffs' "ability to bill insurance carriers at out-of-network rates as they had done in the past, which in turn would affect [plaintiffs'] business model and future profits."

Rosenfarb sought to highlight Clancy's failure to take that Act into account; however, the trial judge precluded him from discussing the Act. Rather, the trial judge only allowed Rosenfarb "to present his conclusions to the jury, but prevented him from discussing the law and explaining how he reached that conclusion."

At trial, Rosenfarb testified that a "comment" he had on Clancy's calculations was that Clancy "assumed that the damages would continue forever." Specifically, Rosenfarb testified that Clancy "failed to take into account significant pending legislation which was going to have an impact on" NJBSC. Rosenfarb opined that the Act would "provide cost containment and consumer protection, which means . . . lower prices for consumers, which means . . . lower fees to physicians." He continued to explain, "Somebody's got to pay the consumers to get lower pricing, that's what the Act is intended. And it's intended to reduce the amount of out-of-network billing so that patients who visit emergency rooms don't get surprise billings."

The court interjected at that point and asked defense counsel to have Rosenfarb explain what the Act does to the calculations. The following exchange then occurred in the presence of the jury between the defense counsel, the court, and the expert witness:

A-2866-19

Q. [G]enerally . . . what is the consequence of Mr. Clancy failing to take account of this law?

THE COURT: You need to tell us, in other words, the financial. Don't tell us about the law, tell us the effect financially.

THE WITNESS: I understand. This law would make it advantageous –

THE COURT: Does make it, right? Isn't that your testimony? Would as opposed to does?

THE WITNESS: I'm sorry. It does. It does make it advantageous to be in-network rather out-of-network. And so there was a – a push in the medical industry throughout New Jersey, throughout the country to go in-network.

THE COURT: Mr. Thompson?

[Defense Counsel]: This is – this is his expert opinion.

THE COURT: I'm going to ask the jury out of here in a minute if he – if you can't control him to do what I want him to do, not to explain the law.

. . . .

It – the jury should disregard the witness's comments about what the law may have intended or what it – he needs – he's a financial expert, he's only qualified to tell us what the effect of the law was on the financial calculations.

A-2866-19

Rosenfarb then offered his opinion as to how this Act affected his own calculations of plaintiffs' damages, and how Clancy should have incorporated the effect of the Act into his calculations. Specifically, Rosenfarb criticized that Clancy overstated the damages calculations because he did not consider whether plaintiffs would go in-network, regardless of whether Valley Hospital entered into the exclusive agreement. Citing Dr. Vingan's deposition testimony where the doctor said plaintiffs would have gone in-network at some point and that the entire industry was moving towards in-network, Rosenfarb recalculated the damages to take into account that plaintiffs would have moved in-network even without the exclusive agreement. To do so, Rosenfarb explained Clancy found that the plaintiffs' agreement with Horizon costs them $7 million a year, and they had to enter into that agreement because of Valley Hospital's exclusive agreement. He then opined that Clancy's calculation

> also calculates that losing [the Hospital] as a customer cost them $2.3 million in profits in 2016 and $3.3 million in 2017 . . . and then forever. And so it's obvious, blatantly obvious, that these surgeons, these brain surgeons, when they sat around after losing [the Hospital] as a customer, they could calculate how much was lost and they would have calculated something like $2.3 million lost in 2016. It doesn't make any sense that they would also enter into an agreement to cost them $7 million a year because they lost $2.3 million from [the Hospital], it's irrational. And that dichotomy, that irrationality points to other reasons to enter into the

81

agreement with Horizon. It couldn't have been just the loss of Valley [Hospital] as a customer, there are other reasons, other factors. One of those factors is the – is the law that was passed. Mr. Clancy didn't take that into account.

Rosenfarb further criticized that Clancy "assumed that the losses from the . . . reimbursement rates experienced by [NJBSC] would continue at the same level going forward indefinitely into the future." In contrast, Rosenfarb assumed that NJBSC would enter an agreement and become in-network with a third party such as Horizon after a two-year period, so he "restated the calculation assuming that two[-]year period, not forever."

On appeal, Valley Hospital argues that the judge committed reversable error by allowing Rosenfarb to state his conclusion but preventing "him from laying the foundation for his opinion." It contends that the "limitation unfairly undercut Rosenfarb's rebuttal and allowed Clancy to escape unrebutted on a foundational mistake in his opinion."

Prior to Rosenfarb taking the stand, plaintiffs' counsel requested that the trial judge preclude Rosenfarb from testifying "as to legal matters," noting that in his report, Rosenfarb made "a number of statements in which he gives legal opinions regarding" the Act. Defense counsel explained that Rosenfarb was going to opine that Clancy needed to consider that the measure of damages

82

plaintiffs made when they were out-of-network was no longer applicable because of the legislation. Plaintiffs' counsel argued that in Rosenfarb's report, he gave "legal opinions as to what the legislation means," and that "at a certain point in time [plaintiffs] would not have been able to receive reimbursements at the same level"; however, the "statute by its express terms doesn't apply to emergency care" or where the service is billed to the carrier. The judge denied plaintiffs' request to bar Rosenfarb's testimony because he was not going to give "legal opinions to the jury," but would give "a damages report to the jury, saying those damages are no longer recoverable." The judge stated that Rosenfarb would give "an opinion now that the damages that are recoverable are," and "not talking about the statute," but "saying the statute does preclude it now."

In support of its position, Valley Hospital cites Conrad v. Robbi, 341 N.J. Super. 424, 441 (App. Div. 2001), for the proposition that "[l]imiting an expert 'to a statement of bare conclusion without giving the expert a chance to explain his or her reasons in detail is not fair or reasonable.'" However, in that case, the defendant had argued that the plaintiff's expert witness testified differently from his expert report, which the defendant argued was a surprise. Id. at 440-43.

That is not the case here because Rosenfarb testified as to his recalculation and the why and how he made his recalculations based on the new legislation.

The judge only prohibited Rosenfarb from discussing the particularities and legal implications of the Act.

This limitation was appropriate because "[i]t is the 'court's function,' not a witness's, to answer questions of law." Kirkpatrick v. Hidden View Farm, 448 N.J. Super. 165, 179 (App. Div. 2017) (quoting Bedford v. Riello, 392 N.J. Super. 270, 278 (App. Div. 2007), rev'd on other grounds in part, aff'd in part, 195 N.J. 210 (2008)). "Any opinions given by witnesses, experts or otherwise, on questions of law need not be accepted by reviewing courts and may be disregarded." Ibid. Accordingly, "legal opinions of witnesses in jury trials are generally disallowed, except in a legal malpractice case or other special setting." Rice v. Miller, 455 N.J. Super. 90, 108 (App. Div. 2018).

Here, the record shows that Rosenfarb was about to discuss the substance of the Act and exceed his expertise as a damages expert by explaining the law and its implications. The judge therefore properly limited his testimony and directed Valley Hospital's counsel to refrain from having Rosenfarb discuss the substance of the Act. Rosenfarb explained why he recalculated the damages in a way that differed from Clancy's method, and stated it was because he believed that plaintiffs would have eventually moved in-network, in part because of the Act, and in part of because of the industry trend and Dr. Vingan's deposition

testimony.  Therefore, the jury heard the basis for Rosenfarb's opinion.  The trial judge did not abuse his discretion in limiting Rosenfarb's testimony.

Valley Hospital additionally argues that the amount of $24.3 million in lost profit damages was excessive because it included $7.4 million that Clancy calculated had resulted from lost volume in the ED.  Valley Hospital contends the jury should have awarded no more than $16.9 million, "consistent with Clancy's opinion on non-ED lost profits," because there was no dispute that the plaintiffs had no right to ED call.  Valley Hospital therefore asserts the trial judge erred "by failing to grant remittitur to account for this mismatch between the jury verdict and the evidence at trial."

In his written decision dated December 2, 2019, the trial judge held that the damages award did not shock the conscience and that remittitur was inappropriate.  The judge stated that the jury's finding of the breach of good faith and fair dealing was unrelated to the breach of contract action, and that the "jury was entitled to award damages based on what they believed was a reasonable reliance on the terms of the contract as it had been executed previously."  The judge found that the jurors were "entitled to find a breach of the [c]ovenant of [g]ood [f]aith and [f]air [d]ealing based on [d]efendants' revocation of [p]laintiff's reasonably expected benefits," and that it "was well within their

A-2866-19

discretion to determine that [p]laintiffs reasonably relied on the ED call and that the two studies conducted by [d]efendant to support their revocation of the ED privileges abused [its] discretion."

Additionally, the judge addressed Valley Hospital's "general argument that the $24.3 million damages award shocked the conscience because [the jury] simply adopted Mr. Clancy's figure in lost profits." However, the judge noted that Clancy's "full loss analysis totaled over $67 million, including [plaintiffs] lost profits due to their contract with Horizon and damages from losing privileges at" Valley Hospital. The judge stated, "[T]here is no way that anyone outside of the jury room could know how the [jurors] reached their number," and it "would be inappropriate to speculate on the matter." The judge concluded that it was "clear that the [jurors] did not just take Mr. Clancy's testimony at face-value as they awarded less than one-third of the total damages amount."

"A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)). "[T]he trial court may not disturb a damages award entered by a jury unless it is so grossly excessive or so grossly inadequate 'that it shocks the judicial conscience.'" Orientale v. Jennings, 239 N.J. 569, 595 (2019). "If a damages

A-2866-19

award meets that standard, then the court must grant a new trial," and also "has the option of recommending to the parties a remittitur or an additur in lieu of a new trial," which "requires the mutual consent of the parties." Id. at 596. Moreover, "[j]udicial review of the correctness of a jury's damages award requires that the trial record be viewed in the light most favorable to plaintiffs." Cuevas, 226 N.J. at 485.

We conclude the trial judge did not abuse his discretion is denying remittitur. The amount of damages does not shock the conscience. As the judge noted, the jury awarded approximately one-third of the total damages calculated by plaintiffs' expert, indicating the jury critically considered the evidence and testimony presented. Clancy's testimony and methodology were not improper and Valley Hospital's counsel cross-examined him as to his methods and calculations, and presented its own expert to rebut Clancy's testimony.

D.

Our Supreme Court has noted that under the appropriate circumstances, "a new trial may be warranted when 'there were too many errors [and] the errors relate to relevant matters and in the aggregate rendered the trial unfair.'" Pellicer, 200 N.J. at 55 (alteration in original) (quoting Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 37 (App. Div. 1998)). An analysis of

cumulative error "does not 'simply entail [ ] counting mistakes, because even a large number of errors, if inconsequential, may not operate to create an injustice.'" Torres v. Pabon, 225 N.J. 167, 191 (2016) (alteration in original) (quoting Pellicer, 200 N.J. at 55).

In circumstances of cumulative error, the Court "neither invited nor countenanced 'appeals that do no more than point to minutiae in an effort to create the impression that there was an atmosphere of unfairness,'" but still recognized "that if a combined effect of multiple errors deprives a party of a fair trial, an appellate court should order a new trial." Ibid.

Here, Valley Hospital asserts that the trial judge erred by barring its analyst from testifying about sixty patients who plaintiffs encountered in Valley Hospital's ED but then later treated at Hackensack. Valley Hospital additionally contends that plaintiffs' counsel made multiple improper and inaccurate statements during his summation. It therefore contends that these cumulative errors prejudiced Valley Hospital, requiring a new trial.

On direct examination, plaintiffs' counsel questioned Berk, a Valley Hospital analyst who worked on the White Paper, about Callandrillo believing that the plaintiffs were transferring patients from Valley Hospital to Hackensack. Specifically, plaintiffs' counsel asked Berk, "There's an idea out

there that maybe patients starting at Valley [Hospital] and were being transferred out by [plaintiffs]? [Callandrillo] said there was some idea out there?" Berk responded, "She mentioned something about that," but could not recall at what point during the course of the study that she learned that. Berk also testified that she did not remember and did not think Callandrillo ever presented her with evidence to show that was happening. Berk testified, however, that "[s]ince then I've seen some other data," but counsel stated he was "talking about . . . up to the time [she] did the analysis and the study was completed." Berk confirmed again that she did not think anyone had showed her data that patients starting at the Valley Hospital ED had transferred out, and she did not recall being asked to look if there was a transfer.

On cross-examination, Valley Hospital's counsel asked Berk about NJBSC transferring patients:

> Q. I think you've testified on direct that . . . you personally did not conclude that, from the data . . . that you observed[,] that the [NJBSC] doctors were seeing patients in Valley's Emergency Department and then taking them to another facility for treatment. Right?
>
> A. Right, I didn't conclude that.
>
> Q. Okay. And . . . did you look into it at the time?
>
> A. I don't think I did.

Q. Did you have access to information from any other hospitals at the time?

A. No.

Q. Did you subsequently get access to information from other hospitals?

A. Yes, I did.

Q. And what did you do?

At that point, plaintiffs' counsel objected, and the court held a sidebar. Plaintiffs' counsel argued that defense counsel was seeking to question Berk about documents she examined after the White Paper report had been written and such information was not known by the Board at the time of the decision to enter into the exclusive agreement based on the finalized report. The judge sustained plaintiffs' objection, stating he was "not going to allow this witness to testify" regarding information that she did not have prior to the White Paper, since "this case is about, whether [Valley Hospital] acted in good faith or bad faith when [it] made the decision" to reduce plaintiffs' privileges.

On appeal, Valley Hospital argues that the question of whether plaintiffs transferred patients that originated in the Valley emergency department to treat them later at Hackensack was a "major issue at trial," and the trial judge erred when it prevented Berk from testifying as to those transferred patients. It

contends the court abused its discretion by limiting the cross-examination by precluding this "key testimony" and preventing Valley Hospital from eliciting from Berk that sixty patients that plaintiffs had encountered in the Valley Hospital ED were later treated at Hackensack.

We conclude the trial judge did not abuse his discretion in limiting the testimony. As noted by the judge, Berk did not have the information that defense counsel sought to illicit at the time of the White Paper study and thus it could not have affected her contribution to that study and therefore was not relevant. Valley Hospital contends that this was a "key issue" and while the record shows the parties spent time during trial on "leakage," the transfer of patients would not have justified the conduct that gave rise to the implied covenant of good faith and fair dealing claim, i.e., the preparation of what the trial judge referred to as a "sham study."

Valley Hospital argues that plaintiffs' counsel made "highly prejudicial" statements during closing statements, warranting a new trial.

Valley Hospital cites four parts of the summation where it contends that plaintiffs' counsel made "misleading or otherwise improper statements that prevented the jury from impartially considering the claims." First, Valley Hospital cites when plaintiffs' counsel stated that Valley Hospital "identified

only two patients [who] had been transferred from Valley's ED to Hackensack and asserted that 'if there were more, [Valley Hospital] would have presented them to us.'" Valley Hospital contends that Berk was going to testify as to these other patients, but the court prevented her from doing so. It thus asserts that it "is impermissible to ask the jury to draw adverse inferences from a failure to offer testimony when a party's own actions procured that silence."

Second, Valley Hospital argues that plaintiffs' counsel "misrepresented the legitimate inferences that could be drawn from certain evidence," when he argued that a chart reflecting "quality scores" for five . . . Columbia Group doctors showed that those doctors were "worse than us." Valley Hospital argues that the mean of the Columbia Group doctors' quality scores was over one standard deviation better than the mean score for NJBSC doctors.

Third, Valley Hospital cites a statement made by plaintiffs' counsel pertaining to plaintiffs' complaint. In Valley Hospital's summation, counsel stated that the complaint stated that NJBSC doctors were not employed by another institution or receiving payments from any hospital. Defense counsel then said that those statements were a lie, since Dr. Roth was employed by Hackensack when the complaint was filed. In his summation, plaintiffs' counsel addressed defense counsel's argument by asserting that the complaint was a

A-2866-19

"legal pleading" and "filed by me. My name is on this. It contains allegations." Valley Hospital argues that those statements "misrepresented facts that were uniquely in [p]laintiffs' possession," and that the complaint was verified by Dr. Vingan, who was accountable for the sworn, false statements.

Valley Hospital's final argument is that plaintiffs' counsel represented during his closing "that Valley's position early in the litigation was that the only reason for the exclusive contract 'was the study. It wasn't about the alignment'" of the neurosurgery department's service lines. Valley Hospital argues that this statement was not supported in the record and counsel aggravated this error "by inviting the jury to conclude that Valley Hospital had changed its story only after [plaintiffs] 'ferreted out' the truth in discovery." Specifically, plaintiffs' counsel argued:

> This study was supposed to be objective and fair. And it was neither. Why? Because the architect of the study, the one who designed the study and the metrics, Gail Callandrillo, had declared two years . . . earlier that the day would come when they got rid of my clients. Don't worry. The day will come. Believe me. In addition, they engaged in bad faith by virtue of their conduct in engaging in negotiations and predetermining that they would enter into an agreement with [] Columbia Group even before the study began.
>
> And I'll address that. Because counsel a moment ago said that this – it's a business deal. It's amazing what's happened over the course of this trial. Because

A-2866-19

from day one, when we instituted this suit, the position of the hospital which were Ms. Callandrillo and Ms. Meyers was, it's all about the study. The only basis upon which we went forward was the study. It wasn't about alignment. It wasn't about our right to partner with people.

. . . .

[A]nd then we found out after this, when we got all the documents and we ferreted out all the information, we then discovered, among other things, this P-116 from Mr. Manger who testified here. I'd appreciate it if you would give me a call back regarding the recent discussions which Dr. D'Ambrosio had with [Meyers] about what, an exclusive contract.

In the trial judge's decision, he found that Valley Hospital failed to object to the comments at the time of the summation and thereby failed to preserve arguments made in its motion for a new trial. He noted, "Clearly, [counsel] did not believe at the time that these statements were unduly prejudicial and [the] failure to object 'deprive[d] the court of the opportunity to take curative action.'" (quoting State v. Timmendequas, 161 N.J. 515, 576 (1999)).

Counsel is afforded "'broad latitude' in summation." Diakamopoulos, 312 N.J. Super. at 32 (quoting Condella v. Cumberland Farms, Inc., 298 N.J. Super. 531, 534 (1996)). "'[C]ounsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting Colucci v.

Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)). However, "[s]ummation commentary . . . must be based in truth," and counsel "may not 'misstate the evidence nor distort the factual picture.'" Ibid. If summation commentary exceeds these limits, the court must grant a new trial motion if the comments are "so prejudicial that 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Ibid. (quoting R. 4:49-1(a)).

A trial court "has broad discretion in the conduct of the trial, including the scope of counsel's summation." Litton Indus. v. IMO Indus., 200 N.J. 372, 392 (2009). Accordingly, the abuse of discretion standard applies to the court's rulings about summations. Id. at 392-93.

Because Valley Hospital did not object to the challenged statements at trial, we review for plain error the trial court's decision allowing the statement to be made to the jury. Under that standard, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018) (quoting R. 2:10-2). "Relief under the plain error rule . . . in civil cases, is discretionary and should be sparingly employed." Baker v. Nat'l State Bank, 161 N.J. 220, 226 (1999) (citation omitted). In our review of a challenge to counsel's summations, we presume that opposing counsel will

object to summation comments which unfairly characterize the evidence and consider the failure to do so "as 'speaking volumes about the accuracy of what was said.'" Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 128 (2008) (quoting Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 495 (2001)). Applying that standard, we find no error, let alone plain error, in the court not sua sponte striking counsel's comments or issuing a curative instruction.

We conclude that the trial judge did not abuse his discretion in denying Valley Hospital a new trial because of opposing counsel's statements during summation. Considering the portions identified by Valley Hospital individually and cumulatively, we discern no basis to disturb the jury's verdict. As noted by the trial judge, Valley Hospital did not object to these statements during summation. Thus, the judge was denied the opportunity to remedy any error and it also indicates that Valley Hospital's counsel did not find those statements to be an issue at the time and in the context of trial.

The court instructed the jury that its recollection of the evidence was what controlled, and not what either counsel argues it presents. The portions of summation identified by Valley Hospital were all rooted in evidence and within the allowable lines accorded to summations. Each party presented the evidence to the jury, framing it how it best suited them, and the court instructed the jury

A-2866-19

that the jury's understanding of the evidence controlled, and it is presumed that the jury followed the court's instructions.

In sum, we find that each of the alleged improper comments during summation do not require a new trial when considered separately, or together, as none were of "such a nature as to have been clearly capable of producing an unjust result." Willner, 235 N.J. at 79.

E.

Valley Hospital's final argument contends the trial judge erred by granting offer-of-judgment damages pursuant to Rule 4:58, asserting that these damages were not available because plaintiffs initially sought both monetary damages and non-monetary relief. Valley Hospital also contends the offer of judgment was invalid because it could not have resolved all claims for all parties.

In a written decision dated January 2, 2020, the judge granted the plaintiffs' motion for litigation expenses and an award of prejudgment interest, pursuant to Rule 4:58. The judge explained that plaintiffs submitted an offer of judgment on March 7, 2019, in the amount of $20 million, which Valley Hospital rejected. At the end of trial, the jury awarded plaintiffs $24.3 million, an amount more than 120 percent of the plaintiffs' offer and thereby satisfied the basic

97

requirement of Rule 4:58. As a result, the judge stated he had "no discretion to deny [plaintiffs] costs and prejudgment interest."

In rejecting Valley Hospital's argument that plaintiff's offer of judgment had been conditional because it was served while the amended complaint still contained a demand for injunctive relief, the judge stated that "[t]his case had previously abandoned equitable relief when it was transferred from the Chancery Division to the Law Division." The judge further cited "multiple letters" from both parties "confirming that this case was solely about the financial aspect and not equitable relief." The judge additionally noted that plaintiffs "did not make any request for equitable relief during trial and no discovery was had regarding such issues," and that plaintiffs' settlement offer was purely a money-offer. The judge stated that because the "complaint merely mentioned equitable relief does not invalidate the offer of judgment or the settlement that would have been effectuated."

The purpose of Rule 4:58 "is to induce settlement by discouraging the rejection of reasonable offers of compromise," and that "goal is achieved through the imposition of financial consequences (the award of fees and costs) where a settlement offer turns out to be more favorable than the ultimate

judgment."  Serico v. Rothberg, 448 N.J. Super. 604, 614 (App. Div. 2018) (quoting Best v. C&M Door Controls, Inc., 200 N.J. 348, 356 (2009)).

"Rule 4:58-2 'accords [the] judge no discretion regarding whether or not to award attorney's fees and costs of suit in an offer of judgment case.'" Feliciano v. Faldetta, 434 N.J. Super. 543, 548 (App. Div. 2014) (alteration in original) (quoting Wiese v. Dedhia, 188 N.J. 587, 592 (2006)).  We "will disturb a trial court's determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion."  Id. at 548-49 (quoting Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008)).

On appeal, Valley Hospital again argues that plaintiffs sought equitable relief as well as monetary damages, making the offer of judgment invalid.  We disagree.  As noted by the trial judge, when the matter transferred from the Chancery Division to the Law Division, plaintiffs sought only monetary damages.  The record shows that plaintiffs represented to the court and opposing counsel that they only sought monetary damages after that time.

Valley Hospital's remaining arguments challenging the award of offer-of-judgment damages lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Plaintiffs filed a cross-appeal. Their arguments, however, are in the alternative and require consideration only if the verdict is "modified in any way," or to the extent there is any remand. Because we affirm, we need not address the cross-appeal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2866-19